Seed, Justice {Ret.),
sitting by designation, delivered the opinion of the court;
In 1946 the plaintiff contracted with the government to construct a flood control dam in upstate New York. Incident to the project was the construction of a tunnel 710 feet long with a diameter of 13 feet after concreting. The *366 contract called for steel ribs and liner plates to be installed as tunnel support in the 50 feet at each end of the tunnel. No other protection than the concreting was provided for the central 610 feet. Plaintiff deemed it necessary to provide steel support for the entire length. This suit is for the large additional expense allegedly involved in installing ribs and liner plates beyond the 50 feet at each mouth.
The plaintiff’s request for authority to use permanent steel supports throughout was first presented by letter to the contracting officer in April 1947, before the supports had been installed. The officer refused to authorize the additional expense on the grounds that the contractor had been furnished full information as to rock conditions at the tunnel site, that the contract limited steel support to one hundred feet, and that the contract placed the cost of protection of the safety of workmen during construction on the contractor. An appeal was taken to the Board of Claims and Appeals of the Corps of Engineers. While that appeal was pending the plaintiff installed the supports for which compensation was claimed.
In June 1948 the Board held a hearing and in December of that year it rendered its decision denying plaintiff’s claim.[1] In 1954 plaintiff timely instituted this action in this court. In this suit, varying the claim presented to the Board for estimated costs of installing the support, plaintiff requested a total of $233,425.25 costs allegedly incurred as a consequence of the government’s refusal to authorize support throughout the tunnel. The primary issue here, too, is the necessity for the additional support. Plaintiff does not contend that this issue is not one of “fact” under the standard “Disputes Clause” in plaintiff’s contract:
“Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or ■his duly authorized representative, whose decision shall *367 be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.”
As the claim was presented under this clause, the suit is governed by the “Wunderlich Act,” 41 U.S.C. §§ 321-322 (1958), which provides that the Board’s decision on matters covered by the Disputes Clauses “shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.” The case was sent to a Commissioner who conducted a second hearing admitting evidence not presented to the Board. The Commissioner recommended that plaintiff recover. This court accepted the Commissioner’s findings and conclusions, 144 Ct. Cls. 500, and, after receiving additional evidence on the question of damages, entered judgment for plaintiff. 157 Ct. Cls. 432 (May 9,1962).
The Supreme Court reversed, 373 U.S. 709 (1963), holding that the Wunderlich Act prevents de novo consideration by a court where an administrative determination has been made. Bather the Supreme Court held the reviewing court is limited to a determination whether there is substantial evidence, based on the record developed before the Board, to support the administrative conclusions.
The case was again sent to the Commissioner after remand from the Supreme Court decision. The Commissioner, after examining the record of the Board hearing, concluded that the Board’s finding for the government was not based on substantial evidence.[2] The parties are agreed that under the Wunderlich Act our scope of review is the same as that exercised by the federal courts of appeals under the standards of Universal Camera Corp. v. Labor Board, 340 U.S. 474, and its progeny.[3]
The task before this court under the Supreme Court decision is to review the determination of the Board of Claims and Appeals of the Corps of Engineers and decide *368 wb.etb.er there was substantial evidence in tbe record as a whole before that Board to justify its conclusion. In reaching our conclusion, we cannot disregard plaintiff’s evidence. However, even though we might have decided as an original matter with plaintiff on balance, the decision of the Supreme Court requires us to go further and uphold the Board’s decision if there was substantial evidence to support the Board’s decision on the record as a whole.
Plaintiff and defendant are agreed that the original contract called for steel ribbing only in the 50 feet of the tunnel nearest to each end. Plaintiff contends, however, that the condition of the rock was such that steel ribs and liner plates were required throughout the tunnel. Accordingly, plaintiff contends that recovery should be granted under paragraph TP4-08 of the specifications, which provides that “Payment for all costs of furnishing and placing liner plates, and tunnel supports, * * * specified herein or directed by the Contracting Officer, will be made at the applicable unit price * * Plaintiff contends that the evidence establishes that the officer should have directed the installation of the liner plates and ribs involved, and therefore that the government should pay for the support. Plaintiff also points to TP4-03, which provides:
“TP4 — 03. Tunnel Protection. — a. Scope. — The tunnel protection shall be furnished and placed as required for distances of approximately the first 50 feet at each end of the tunnel which includes the underground portion of the outlet transition. Such tunnel protection conforming to the cross-sectional shape of the tunnel and transition, shall consist of steel arch ribs and corrugated steel liner plates as indicated on the drawings or required, including tie rods and spreaders. * * *” [Underscoring supplied]
As an alternative theory, plaintiff argues that the condition of the rock was sufficiently different from that revealed by test borings to show the supports became necessary by virtue of changed conditions within the meaning of Article 4 of the contract:
“Article 4. Changed Conditions. — Should the contractor encounter, or the Government discover, during the *369 progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall with the written approval of the Secretary of War or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.”
The Board rejected plaintiff’s contention that it had encountered changed conditions. The Board held that the testimony indicated that the job could have been completed with the aid of temporary supports at vertical joints in the rock. Under the contract “temporary” supports are not to be computed as pay items. It was further thought that plaintiff’s delay from the holing out in March until December 1947 when the concreting was started had contributed to the rockfall that had occurred in the tunnel, and that the rockfall after the holing out was not excessive. The Board also found that the failure to undertake concreting promptly and air slaking due to the failure to seal up the tunnel were the cause of what it termed “gradual deterioration” of the rock.
The Commissioner found these conclusions unwarranted. First, the conclusion that “temporary” supports would be adequate for the protection of the workmen was rejected. The Commissioner apparently took the position that because backpacking would be used even with wooden lagging, and the backpacking would ultimately be encased in concrete when the tunnel was grouted, such support could not be deemed “temporary” under the specifications. Further, the photographs introduced by plaintiff showed substantial amounts of rockfall in the period shortly after the *370 tunnel was lioled out. The Commissioner agreed with the plaintiff that this demonstrated the threat of rockfall into wet or uncured concrete if the grouting had been undertaken immediately. And last, the Commissioner disagreed that the plaintiff had contributed to the rockfall by failing properly to seal up the tunnel while awaiting the grouting process. The Commissioner held that the provision of the contract that the tunnel shall be “adequately lighted and ventilated” prevented any sealing to prevent temperature and humidity changes from causing rockfall. Further, he thought the actual rockfall was to a large extent in pieces too large to have been caused by air slaking.
We are unable to agree with the Commissioner that the Board’s conclusions were unsupported by substantial evidence. The plaintiff, in order to recover, must establish either that changed conditions were encountered within the meaning of Article 4 quoted above, or that the permanent steel ribs and liner plates were necessary to the completion of the tunnel and therefore should have been directed by the contracting officer under paragraph TP4-08. We do not consider the view of the Commissioner that the failure to seal up the tunnel is an inadequate basis for denying recovery on the evidence adduced before the Board. We hold that the Board was warranted in finding that no changed conditions were encountered necessitating the support and that the contracting officer was not required under the circumstances to direct the installation of steel ribs and liner plates throughout the tunnel.
The testimony before the Board consisted of the ¡views of four witnesses for the plaintiff and three for the government.
Thomas A. Coyne, the plaintiff’s general superintendent, testified that the nature of the rock did not change as the tunnel was dug deeper. Vertical joints in the rock appeared every 3 to 5 feet. Earlier test borings had not revealed these joints because no borings had been made at an angle. Because of winter weather, the grouting was not started as soon as the tunnel was holed out. By April the roof of the *371 tunnel had started to fall and by August the volume of fallen rock had reached 203 cubic yards. Temporary supports would not have been feasible because it would not have been practicable to remove the backpacking that would have been necessary. The contractor would have been required tlo encase the backpacking in concrete during the grouting process. Mr. Coyne had had no prior experience in tunnels of this length.
Elford H. Richardson, plaintiff’s chief engineer, testified that there was no data as to the dates on which the rock fell, but that over the entire March to August period some 203 cubic yards fell, including some that had to be trimmed for the installation of liner plates.
Everett Diehl, the chief engineer of the subcontractor that excavated the tunnel, testified that weakness in the roof had been noted from the outset. Steps were taken in blasting to avoid causing rockfall, and the tunnel was holed out without incident. The rockfall between March 12 and the end of the clean-up on March 25 was approximately 60 cubic yards in Mr. Diehl’s estimation. The total volume of the excavation was 6,000 cubic yards. Mr. Dielil could not estimate whether 3% (203/6000) was an excessive fall because he had had no prior experience in unsupported tunnels of this length. Mr. Diehl also testified that the resident engineer told him at the time of the excavation that the only circumstance under which permanent support would be authorized would be if it became necessary to prevent the collapse of the tunnel bore, i.e., to prevent the failure of the tunnel itself. ¡
Irving B. Crosby, plaintiff’s consulting geologist, testified that he visited the dam in April 1948. At that time the tunnel was largely lined with concrete, but some 140 feet were unlined. The steel ribs and liner plates were installed throughout. The liner plates were so installed that Mr. Crosby could see “almost to the crown of the roof.” Mr. Crosby expressed the view that the rockfall was chiefly due to the fracturing of the rock. The rock contained parallel systems of fractures intersecting at more or less right angles. *372 These fractures were not indicated on the contract drawings and there was no way of knowing that the roof conditions would be so bad. If no support was provided, it would have been likely that rock would have fallen through the wet concrete.
The first government witness was David C. Congleton, chief of the Dam Design Section of Baltimore District. He had had some 15 years experience in tunnel construction. He testified that no likelihood of rockslide was seen except at the ends of the tunnel where the 50 feet of permanent steel supports were provided. It was assumed that the roof would stand wthout further support once the concrete lining was installed.
C. B. McGavock, Jr., a geologist with the Baltimore District, testified that he examined the tunnel in June 1947, before the support was installed. He estimated at the time that he examined “the upstream half” of the tunnel, but did not see the remainder of the tunnel because of water. He later testified before the Board that he examined all but about 200 feet. He stated that the rockfall was largely in three areas comprising about 100 feet in total. These areas were where intersecting joints occurred at particularly acute angles. Some form of “temporary” support would be necessary in these places, but as to the remainder of the tunnel there was no reason why it could not safely be grouted without support. Scaling with the jumbo would be necessary. Mr. McGavock also expressed the view that if the tunnel had been sealed up to prevent outside air from entering during the period after the cleaning up, much of the expansion causing the rockfall that did occur would not have taken place.
The last witness was Donald E. Mather, the government’s resident engineer on the project. He testified that the contract required steel lining only where necessary for the support of the tunnel on a permanent basis. Support necessary for the workmen while concreting was the responsi *373 bility of the plaintiff under TP4-02.[4] He also expressed the view that there was no need for any permanent protection. Temporary protection was probably necessary in some parts of the tunnel where the roof was weak. He testified that the rockfall that occurred was not unusual. If he had found unstable rock in the middle of the tunnel similar to that at the portals he would have authorized steel ribs and liner plates.
It appears to us that it cannot be said that the Board’s decision was without substantial support in the record. Whether the steel ribs and plates were necessary for the maintenance of the tunnel was the central issue. On that question Mr. Crosby testified for the plaintiff and Mr. Mc-Gavock for the government. Both men were qualified geologists. They disagreed on the cause of the rockfall— Crosby attributing it largely to ground water and Mc-Gavock to expansion from contact with the air. But McGavock’s unequivocally expressed judgment was that only temporary support was necessary at three areas of major rockfall. Crosby does not directly controvert this *374 judgment. The strongest statement that he made was in the following excerpt:
“McCarron [plaintiff’s counsel]: Will you tell us whether or not, in your opinion, the contractor could, have lined this tunnel without the use of some form of permanent tunnel support, having in mind the character of the rock, without destruction or damage to the concrete lining?
Crosby: You mean, could he have lined it without leaving some support in there ?
McCarron : Assuming no support was provided at all, would it have been possible for him to line it with concrete without having falling rock?
Crosby : I think in some cases they might have gone through the concrete and crashed to the floor which would have left voids in the concrete which would have been exceedingly detrimental to the permanent safety of the tunnel.”
It appears that Crosby did not express his views on the necessity of the type of support, temporary or permanent, steel or some less expensive substitute, but rather tha,t he at best expressed the view that some sort of support was necessary. It is not clear whether that support was thought necessary while the concrete was hardening or whether it was deemed necessary for the permanent support of the tunnel.
We have here a conflct in testimony by witnesses shown to have had enough knowledge of tunnel construction to make them competent to express conclusions as to the necessity for extension of the steel supports beyond the distances called for by the contract. It is situations such as this that call for the application of the rule that where there is substantial evidence to support varying decisions, the conclusion of the Board of Claims and Appeals of the Corps of Engineers must stand.
That the backpacking would be encased in concrete after the grouting does not, in our view, render the support “permanent” rather than “temporary.” The specifications contemplated that the contractor bear the burden of “temporary” support “for the safety of workmen.” The inference seems plain that the contractor was left to its own devices to protect its men in the course of the construction. The support for *375 which, the government agreed to pay was that which was necessary to the maintenance of the tunnel. Unless it can be said that the steel ribs and plates were reqiured for the permanent support of the tunnel, no recovery is proper.
This interpretation seems inescapable to us when the provision of TPN03, referring to “tunnel protection” and specifying steel ribs and plates in the 50 feet at each end, is compared with TP4-02, dealing with the excavation procedure and calling for “temporary tunnel protection * * * where required for the safety of workmen.”
The latter form of support is not compensable, while the former is, under TP4-08. Had the contract contemplated payment for supports designed only to protect the workmen while the job was being completed, it seems reasonable to suppose that TP4r-08, or some comparable paragraph, would have made this express.
We find it impossible to say that the Board could not properly conclude that the steel ribbing and plates were not required for the continued support of the tunnel. The Board’s views on the cause of the rockfall that occurred from March to August do not constitute the basis of our affirmance. Whether the fall was due to the contact with the open air or not, and whether or not plaintiff should have sealed the tunnel while no work was underway, the critical issue remains the necessity for steel supports throughout the length. On that question the Board’s conclusion that “vertical joints encountered at three central locations representing less than 100 feet of tunnel length could have been supported with relatively little temporary protection,” seems buttressed by substantial evidence.
Plaintiff urges that the testimony of their Mr. Richardson, as well as photographic evidence, shows that there were 9 or 10 areas of major rockfall. Accordingly, plaintiff contends that the view of Mr. McGavock, the government’s geologist, that there were three areas covering less than 100 feet requiring temporary support is untenable. But as Mc-Gavock testified, he entered only one-half of the tunnel. As such, his testimony would be expected to relate only to one-half. An examination of the rockfall by area in the tunnel shows that plaintiff’s own data shows three monoliths in the *376 upstream half of tbe tunnel, each 30 feet of tunnel length, at stations 25+74, 26+04, and 26 + 34, with rockfall above 5 cubic yards. There are 5 such monoliths in the downstream half, uninspected by McGavock, but these show a total rockfall about equal to that in the three upstream monoliths. It does not appear to us to be demonstrated that the lesser rockfall in the other areas could not have been averted by scaling, or was even dangerous. Again we must conclude that the question presented to the Board was one calling for the exercise of judgment and one on which we may not substitute our guess for the conclusion of the administrative body.
Plaintiff also suggests that the Board could not accord greater credence to McGavock’s testimony than to Crosby’s. McGavock entered only one-half the tunnel. Further, in a contemporaneous report he stated that the bedrock was “thin bedded, hard gray sandstone * * * with interspaced partings and zones of black, fissile shale.” Before the Board McGavock described the rock as “shale of the mechanical sedimentary type.” Plaintiff suggests that because of this discrepancy, McGavock’s testimony must be discredited. We do not agree. Nothing was made of this point on cross examination. As we are not geologists, the extent or import of the asserted discrepancy is at best obscure. We cannot say that the Board was compelled to disregard McGavock’s opinion on this basis.
It is pertinent that Crosby’s testimony is also subject to some skepticism in that he entered the tunnel for the first time in 1948 when all but 140 feet had been lined with concrete and steel ribs, and liner plates had been installed throughout the tunnel.[5]
The last issue in the case, whether the Board was warranted in concluding that there were no changed conditions, seems to us to fall equally into the area reserved to the administrative agency. The government produced testimony by McGavock that anyone familiar with the area and the type of rock should know that there would be joints throughout the rock. Crosby testified that the fracturing system could not be anticipated to be so bad. The borings *377 did not reveal the joints for the obvious reason that they were taken only vertically, i.e., parallel to the joints themselves. Again this seems to be an issue on which there was conflicting expert opinion. Plaintiff does not raise any specific refutation of McGavock’s testimony and therefore we cannot say that the Board was without support in adopting McGavock’s view over Crosby’s.
Furthermore, the issue, even if the rock fracturing were unable to be anticipated, remains whether the changed condition required the installation of the steel supports. On that issue, as we have stated, we find the Board’s conclusions adequately supported.
The purpose of the adoption of the rule of the Wunderlich Act, submitting determinations of technical disagreements between parties to government contracts to boards familiar with the subjects of such contracts, was to have determinations by experts. No charge of fraud arises in this case. The conclusion of the Board has substantial support in the record as a whole and must be upheld. Judgment is entered for the defendant and plaintiff’s petition is dimissed.
CONCLUSION 03? LAW
Upon the foregoing opinion which includes therein the findings of fact made by the court as a part of its judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.
Davis, Judge, took no part in the consideration and decision of this case.

 The Board’s decisions are not officially reported. The opinion is to- be found in the printed record in the Supreme Court, Carlo Bianchi v. United States, 373 U.S. 709, Record p. 160.

 Commissioner’s Determination Pursuant to- Court’s Order of July 12, 1963, 162 Ct. Cl. 876, upon Remand from the Supreme Court of the united States, filed November 4, 1963.

 PI. Br. 40 — 4-5 ; Def. Br. 7-10.

 “xp4_o2. Tunnel Excavation, a. Scope. The tunnel bore may be driven from either or both ends by any of the usual methods of tunneling, provided the driving is continuous and progress is consistent with that indicated on the progress schedule. Temporary tunnel protection shall be provided where required for safety of the workmen and shall be placed progressively after each heading blast and prior to resumption of excavation and drilling operations. The tunnel shall be maintained free of water by means of drains and sump pumps. Tunnel dust shall be kept under proper control by wet drilling and sprinkling. The tunnel shall be adequately lighted and ventilated. Only electric or air motorized equipment shall be used in the tunnel. An adequate power supply shall be available at all times. All rock projections inside the tunnel neat line shall be removed and overbreak beyond the tunnel pay line shall be backfilled with approved material, compacted to the required density without cost to the Government. Where and as the arch ribs and liner plates are placed to the designated grade and alignment, the overbreak voids at the crown and haunches shall be progressively backpacked with selected tunnel excavation in a way that will hold the completed tunnel protection on line and grade. Where such tunnel protection is not required all overbreak beyond the tunnel pay line shall be backfilled with concrete. Such work shall be done together with placing of the concrete tunnel lining. After the concrete tunnel lining is in place and prior to tunnel and collar grouting the entire length of the tunnel shall be grouted at a pressure not to exceed five pounds to complete filling remaining overbreak voids. Such grouting including furnishing and placing of grout pipes will not be paid for as a unit and all costs shall be included in the contract unit price for tunnel concrete lining. Disposal of tunnel excavation shall be in accordance with subparagraph TP3-01d."

 See note 1 above and page 120 of tbe printed record referred to therein.