**JEFFERSON CONSTRUCTION CO. OF FLORIDA, a Florida Corporation,**

v.

**The UNITED STATES.**

No. 67–65.

United States Court of Claims.
July 15, 1966.

Carl A. Hiaasen, Fort Lauderdale, Fla., attorney of record, for plaintiff. McCune, Hiaasen, Crum & Ferris, Fort Lauderdale, Fla., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner C. Murray Bernhardt with directions to make recommendation for conclusions of law on plaintiff's motion for judgment on the pleadings and for summary judgment and defendant's cross-motion for summary judgment. The commissioner has done so in an opinion and report filed on February 7, 1966. Exceptions to the commissioner's report were filed by the parties and the case was submitted to the court on plaintiff's request for review of the report and opinion, the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiff is not entitled to recover, plaintiff's motions for judgment on the pleadings and for summary judgment are denied, defendant's cross-motion for summary judgment is granted and the petition is dismissed.

Commissioner Bernhardt's opinion *, as modified by the court is as follows:

These dispositive cross-motions [1] portray a case of misleading contract drawings counteracted by a warning specification and a contractor's duty to inquire. The case originates in a contract awarded plaintiff to construct a levee in Florida. Earth for the levee was to be obtained from a "continous borrow pit" bordering the levee embankment site throughout its 7.65-mile length. Specifications enumerated the minimum equipment to have on the job. Drawings provided dimensional and other data for the levee and the adjacent borrow pit. On behalf of its subcontractor which sustained the eventual loss, the plaintiff contends that the drawings depicted a borrow pit of much narrower width than was actually required, and that the greater width necessitated the use of more equipment and rehandling of more borrow material than the plaintiff could have reasonably contemplated. This came about because a dragline of a given boom length, operating in the center or on the edge of the berm could have scooped each load of earth from a borrow pit with a bottom width of 100 feet and deposited it in position on the levee embankment in one continuous motion, whereas in a wider borrow pit the reach of the dragline boom would be insufficient to perform the operation in one motion but would require rehandling of excavated material. At the conclusion of performance the contractor submitted a claim of $297,229.93 to the contracting officer under the standard Changes clause of the contract for its unanticipated costs. The Corps of Engineers Board of Contract Appeals confirmed the contracting officer's rejection of the claim for the assigned reason that the plans and specifications, read together were not misleading and contained information sufficient to enable plaintiff to estimate accurately the width of the borrow pit required to provide the known quantity of earth to build the levee embankment to its design dimensions.

Sheet 3 of the contract drawings depicts a typical cross-section of the levee and its adjoining borrow pit on a given scale. Typically the levee cross-section shows an earth mound of prescribed configuration, a flat earth berm connecting it to the borrow pit, and a borrow pit with sloping sides and a flat bottom. An extension of one side of the borrow pit is shown in dotted lines marked "Additional Excavation as required for levee fill", meaning that any additional borrow material to meet the earthfill requirements of the levee would be obtained from that side of the borrow pit farthest away from the levee. Application of the scale to the borrow pit drawing discloses a bottom width of 80 feet, plus 20 feet horizontally for additional excavation if needed. The typical cross-section states in a legend, however, that the bottom width of the borrow pit "Varies (see profile)", and below that is the wording—

Bottom widths of required continuous borrow pit section shall be as shown on the profile except as otherwise provided in the specifications.

The profile information referred to in the drawing on sheet 3 is contained in sheet 4 of the drawings. Sheet 4 depicts core boring and elevation data at ten separate locations on the length of the levee. These ten sections reflect bottom widths of the continuous borrow pit ranging from 60 to 100 feet. In most areas of the levee the actual width of the excavated borrow pit approximated 200

---

* The opinion and recommended conclusion of law are submitted pursuant to order of the court under Rule 54(b). The facts are stated in the opinion.

1. Plaintiff's motion for judgment on the pleadings and motion for summary judgment, and defendant's cross-motion for summary judgment. Plaintiff's motion also prays that the defendant's affirmative defense in paragraph 12 of the answer be stricken. Paragraph 12 of the answer alleges plaintiff's failure to plead that the decision of the Corps of Engineers Board of Contract Appeals was arbitrary, capricious, etc., as per the Disputes clause of the contract.

feet, thus causing the additional costs for which the plaintiff seeks reimbursement.

The Board reached no clearly stated decision on the conflicting evidence of the parties as to whether the job could have been performed on time with the equipment listed in the specifications as the minimum required to perform if the bottom width of the borrow pit had averaged 100 feet as the plaintiff had anticipated. The plaintiff had mobilized the minimum list of equipment on the job at the outset. However the notice to proceed issued by the contracting officer to the plaintiff warned the latter that it had "insufficient equipment to prosecute the work within the time element specified in the contract", and threatened to terminate the contract if plaintiff did not prove within 90 days that it had sufficient equipment.

■ The Government's principal defense is based on paragraph 2–03a. of the Technical Provisions of the contract, reading as follows:

a. Continuous Borrow Pit for L–49: The continuous borrow pit adjacent to Levee 49 shall conform to requirements prescribed herein and as shown on the drawings. Embankment materials available in the required cross section of the continuous borrow pit, as shown on the drawings, are estimated to be less than the amount required to build the levee. The additional levee fill required shall be obtained by extending the excavation as indicated on the drawings. If the required borrow pits should yield more fill material than needed for embankment construction, the width shall be decreased uniformly from top to bottom as required. It is recognized that variations in the nature of the materials encountered and the quantity of fill required for the levees will result in the width and/or depth of the borrow pits being greater than the "Re-

quired Continuous Borrow Pit Section" indicated on the drawings. The bottom of the canal shall be left relatively smooth and level. Abrupt changes of grade or width shall be avoided. All suitable materials excavated shall be used in the adjacent embankment.

The cited Technical Provision should have been enough to alert the plaintiff to the likelihood that the borrow pit would have to exceed the widths shown on sheets 3 and 4 of the drawings in order to provide sufficient fill for the levee design, or at least put plaintiff on notice to inquire, assuming that the contract documents furnished enough data for such ascertainment. While ambiguous contract provisions are construed against the author (Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390 (1947), and a contractor is not usually obligated to seek clarification of all interpretative problems inhering in the contract terms, he must nevertheless inquire where the discrepancy, omission or conflict is obvious (Consolidated Eng'r Co. for use of Fulton Nat. Bank of Atlanta v. United States, 98 Ct.Cl. 256, 280 (1943); Jefferson Construction Co. v. United States, 151 Ct.Cl. 75, 89–91 (1960)), and most particularly so when a specification provision affirmatively warns him of such possible discrepancies in the plans (WPC Enterprises Inc. v. United States, 323 F.2d 874, 876, 163 Ct.Cl. 1, 6 (1963), and collated authorities), or where a contract article requires him to submit detected discrepancies to the contracting officer for decision (Beacon Construction Co. of Mass. v. United States, 314 F.2d 501, 504, 161 Ct.Cl. 1, 6 (1963)).[2] The unit price schedule in the contract in suit gave the amount of excavation estimated for the levee, and this proved to be reasonably accurate. The Board found, and this may be accepted as a finding of fact based upon the administrative record of adversary testimony and exhibits, that "the plans and specifications contained

---

**2.** Article 2 of the contract in suit is virtually identical to the corresponding article in the *Beacon Construction case*, supra, which was invoked by the court to counter the general rule that ambiguities in a contract will be construed against the party drafting the instrument.

sufficient information for the making of the computations above described had appellant chosen to do so." The computations "above described" involved a computation of the cross-sectional area of the levee and berm at several stations throughout the length, a similar computation of the cross-sectional area of the required borrow pit at the same stations, and consequent mathematical calculation of the excess borrow pit width to be excavated to supply the required quantities of borrow material.

 Neither of the parties point out the precise mechanics of this mathematical computation so that it may be determined whether the above finding of the Board is supported by substantial evidence. The defendant has attached to its motion the entire administrative record, but if that record does not support the Board finding it is the plaintiff's responsibility to establish the fact. It is not the court's duty to supply such a deficiency by an independent study of those parts of the administrative record not selected by the parties for scrutiny, although the court is not precluded from doing so if it chooses. The Board finding that the plaintiff could have ascertained the borrow pit widths by a mathematical analysis of data in the contract documents must, therefore, be accepted as unchallenged, leaving only the added question of whether circumstances would excuse plaintiff from thus protecting itself from an improvident bid.

 The only circumstances which offer possible excuse for the plaintiff's omission are the misleading nature of the drawings on sheets 3 and 4, and the fact that plaintiff was given only two weeks prior to bid opening for the preparation of its bid. We are not informed as to the reasons why the borrow pit widths shown in the profiles on sheet 4 ranged only from 60 to 100 feet, no more than we are told of the actual borrow pit widths at those ten stations. Standing alone, the drawings on sheets 3 and 4 would have been enough to warrant the plaintiff's conclusion that the maximum borrow pit width would be 100 feet, but the draw-

ings caution bidders to consult the specifications. Technical Provision 2.03a. of the specifications (quoted, supra) could not have been read by any thinking bidder without conveying the clear warning that the borrow pit dimensions shown in the drawings were probably not enough to provide sufficient fill for the levee requirements. Even at this point the plaintiff might have been excused for misunderstanding the borrow pit dimension prospects if it had been unable to extract from other contract documents the actual conditions. The means to satisfy this inquiry were apparently at hand but not availed of for reasons we can only surmise. It is not enough for the plaintiff to plead lack of opportunity because of the restricted period available for the preparation of its bid estimates, for the trite but true answer to that is that it should not have risked submitting a bid without paying careful attention to the specifications.

In finding the plaintiff to be technically liable for its own carelessness in underestimating contract requirements, it is to be remarked that the Government was also negligent in the preparation of data for the invitation. Quite obviously the Government was mistaken as to the prospective widths of the proposed borrow pit at the time the invitations and drawings were framed, else the drawings would have suggested borrow pit widths more closely approximating the actual widths and the minimum list of equipment required to do the job would have been substantially greater than that contained in the specifications. Obviously, too, the Government became aware of its error sometime prior to issuance of the notice to proceed, for coincidentally with the proceed order the contracting officer warned the plaintiff that the minimum items of equipment which the plaintiff had mobilized at the outset were not sufficient and, unless it was augmented within 90 days by enough to perform the work within the required time, the contract would be terminated. Perhaps the contracting officer, at this juncture, could have admitted his error and re-

advertised the contract with corrected drawings. Or he could at least have amended the drawings prior to award-ing the contract and given those who had bid an opportunity to amend their bids.[3] Instead, the contracting officer chose to rely on the protection afforded by paragraph 2–03a. of the Technical Provisions, realizing that this clause put the onus of error on the bidders.

On the state of those parts of the administrative record specified by the parties there seems to be little doubt of the factual and legal correctness of the Board's decision. However, in its petition the plaintiff asks permission to submit at trial additional expert testi-mony "touching the construction and interpretation" of the contract. Morri-son-Knudsen Co., Inc. v. United States, 345 F.2d 833, 170 Ct.Cl. 757 (1965), holds that where a contract appeals board can grant relief on a claim whose predomi-nant issue is one of law, such as the inter-pretation of contract provisions, its find-ings as to facts directly related to the legal issue are to be accorded finality under the Wunderlich Act, 41 U.S.C. §§ 321, 322, and the decision of the Su-preme Court in United States v. Carlo Bianchi & Co., Inc., 373 U.S. 709, 83 S. Ct. 1409, 10 L.Ed.2d 652 (1963). As in the *Morrison-Knudsen case,* supra, our plaintiff's claim was prosecuted admin-istratively under the Changes clause; both involved primarily the interpreta-tion of contract provisions; as such the issue in each was one of law, well within the Board's authority to adjudicate with-out finality, but the Board's decision on related facts must necessarily be accord-ed finality and cannot be judicially sup-plemented by a new trial in the court. *Ergo,* the plaintiff's request for permis-sion to present *de novo* evidence must be denied, its motions for judgment on the

pleadings and for summary judgment must be denied, the defendant's motion for summary judgment must be granted, and the petition dismissed.

present case. The plaintiff accepted the amendments in its bid. Thus the Gov-ernment did nothing to clarify the am-biguity in the drawings even though the occasion presented itself.

---

3. On December 13, 1960, nine days prior to the submission of plaintiff's bid, the contracting officer amended the invitation by issuing revised plan sheets 2, 3, and 4, making minor amendments to drawings which do not affect the issues in the