**James H. CLACK**

v.

**The UNITED STATES.**

No. 155–63.

United States Court of Claims.

May 10, 1968.

John F. Taylor, San Francisco, Cal., attorney of record, for plaintiff. Dinkelspiel & Dinkelspiel, San Francisco, Cal., of counsel.

Edwin J. Reis, Washington, D. C., with whom was Asst. Atty. Gen. Edwin R. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

COLLINS, Judge.*

This action involves three claims that arose out of a contract between plaintiff, James H. Clack,[1] an individual, and the defendant, acting through the Bureau of Public Roads, Department of Commerce.

The court holds that plaintiff is entitled to recover on one of the claims involved in the case, but is not entitled to recover on the other two claims.

Under the contract involved in this case, numbered CPR 7–2116, plaintiff constructed 8.771 miles of forest development road within the boundaries of the Six Rivers National Forest in California and a bridge on the same road. The contract was awarded to plaintiff in February 1957, and the work was completed in November 1959.

The contract contained provisions of the subjects of "Changes," "Changed Conditions," and "Disputes," similar to those customarily included in Government construction contracts.

Plaintiff disagreed with the final estimate prepared by personnel of the Bureau of Public Roads regarding the amount due plaintiff upon completion of the work under the contract. Because of the disagreement, plaintiff presented to the contracting officer, on April 23, 1960, eight claims for additional compensation, such claims being designated as items A through H, inclusive.

On April 23, 1962, the contracting officer made his findings and determination respecting plaintiff's claims for administrative relief. Five of the claims (items B through F) were disposed of by the contracting officer in a manner satisfactory to plaintiff. However, plaintiff was not satisfied with the contracting officer's action relative to the claims designated as items A, G, and H; and, as to these three claims, plaintiff took an appeal, on May 28, 1962, to the Department of Commerce Appeals Board (acting for the Secretary of Commerce). A 4-day hearing was held in October 1963 in Washington, D. C., on the claims. On August 24, 1964, the Board rendered its decision (Appeals Board Docket No. PR–38), denying plaintiff's appeal in its entirety. Plaintiff applied for reconsideration of the decision and, on May 3, 1965, the application was denied.

The present court action involves the three claims considered and rejected by

---

\* The court acknowledges the contribution of Commissioner Mastin G. White, substantial parts of whose opinion we have incorporated. We reach the same results as he did, though, in some instances, on slightly different grounds.

1. Pursuant to the Assignment of Claims Act of 1940, 41 U.S.C. § 15 and 31 U.S.C. § 203, plaintiff Clack originally assigned this claim to Bank of America, N. T. & S. A., to secure certain indebtedness owing by him to his assignee. However at the pretrial conference held in Washington, D. C., on December 10, 1965, the parties agreed that the obligations which formed the basis of the assignment to said bank had been fully satisfied, and that James H. Clack, individually, held exclusive rights to all claims asserted in the petition.

the Department of Commerce Appeals Board.

By agreement and under order of this court, both plaintiff and defendant moved for summary judgment, based upon the record before the Board.

## ITEM A

Item A is a claim in the amount of $25,275 for alleged additional and unanticipated work resulting from numerous and chronic landslides which occurred during the progress of the job. Plaintiff claims this resulted in considerable additional expense to plaintiff in removing the vegetation from the earth that came down with the slides.

The evidence in the administrative record shows that, during the progress of the work under the contract, many landslides occurred along the route of the roadway. These landslides, approximately 28 in number, occurred in areas where the roadway had been cleared and grubbed and where the road had been partially constructed. They were attributable to the unstable nature of the earth's surface in the rugged terrain through which the road was being constructed.

The landslides referred to in the preceding paragraph not only carried quantities of dirt onto the roadway, but most of them also deposited on the roadway uprooted trees, brush, and other vegetation mixed in with the dirt.

Much of the dirt which the landslides deposited on the roadway was removed by plaintiff and utilized as fill in connection with the construction of other portions of the road. This was considered by the defendant to be "unclassified excavation" work, and the defendant paid plaintiff for such work at the rate of 40 cents per cubic yard as prescribed by the contract for unclassified excavation (bid item 24(1))· There is no controversy between defendant and plaintiff in the present action with respect to this aspect of the matter.

However, before the dirt that was brought onto the roadway by the landslides could be removed for use elsewhere as fill, it was necessary for the dirt to be separated from any trees, brush, or other vegetation, that might be mixed in with it. It was also necessary, under the contract, for all the trees, brush, and other vegetation, that had been brought onto the roadway by those landslides, to be removed from the roadway. Such trees, as constituted merchantable timber, were to be converted into logs, and plaintiff was required to stack them alongside the road. Plaintiff seeks additional compensation for the work involved in clearing away and disposing of the trees, brush, and other vegetation that had been brought onto the roadway by the landslides.

One of the bid items involved in the contract was 20(1), "clearing and grubbing," for which a unit price of $1,250 per acre was fixed. This work was described in the contract specifications as "clearing the designated area of all trees, down timber, snags, brush, and other vegetation, rubbish, and all other objectionable material, and shall include grubbing stumps, roots, and matted roots, and disposing of all spoils material resulting from the clearing and grubbing."

The personnel of the Bureau of Public Roads on the job took the position—as did the contracting officer and the Department of Commerce Appeals Board —that the task of removing from the roadway and disposing of the uprooted trees, brush, and other vegetation that had been deposited by the landslides constituted "clearing and grubbing" work, which was compensable under item 20(1) of the contract. The area involved in such operations was computed by personnel of the Bureau as totaling 4.98 acres, and plaintiff was compensated for this work at the rate of $1,250 per acre.[2]

2. Plaintiff did not establish at the administrative hearing that the Bureau's computation of the area involved in clearing away the slide material was inaccurate.

Plaintiff contended before the Board that the task of clearing from the roadway and disposing of the trees, brush, and other vegetation, which had been brought onto the roadway by the landslides, involved a type of work that was different from, and more difficult and expensive than, the regular clearing and grubbing work necessary in preparing the roadway for the construction of the road. The Board, however, took a different view of the facts. It found that "The evidence does not indicate that work involved in removing the fallen timber from the slides was any greater than would have been necessary if the clearing and grubbing had been performed in advance of the slide. The occurrence of the slide made grubbing unnecessary."

■ This determination is supported by substantial evidence. It was no longer necessary for the timber to be felled. Defendant's project engineer on the job testified that the timber could have been dragged from the slide material, but often even this was not done. Instead, the slide material was merely pushed off the road into a gully. Certain photographs in the record lend credence to this testimony. Since plaintiff was very rarely on the job, the only first-hand evidence in the record to support plaintiff's claim consists of affidavits of two of plaintiff's employees. Given this record, we can only conclude that substantial evidence supports the Board's factual determination. Williamsburg Drapery Co. v. United States, 369 F.2d 729, 733, 177 Ct.Cl. 776, 783 (1966); Carlo Bianchi & Co. v. United States, 167 Ct.Cl. 364, 374 (1964), cert. denied, 382 U.S. 841, 86 S. Ct. 32, 15 L.Ed.2d 82 (1965).

Moreover, plaintiff's claim is fatally deficient for yet another reason. In seeking damages resulting from numerous landslides, plaintiff is obviously claiming additional compensation in the nature of an equitable adjustment under the "Changed Conditions" provision of the contract. This provision of the contract reads as follows:

## 4. CHANGED CONDITIONS

The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. * * * If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof. [Clause 6 dealt with "Disputes."]

■■ It is plain from the language quoted above that the "Changed Conditions" provision of the contract was intended to authorize an adjustment of the contract price only with respect to physical conditions that were unknown to, and could not reasonably be anticipated by, the parties at the time they entered into the contract. At the administrative hearing, plaintiff admitted that, in connection with the preparation of his bid, he estimated that it would be necessary to move some slide material in constructing the road. Plaintiff also explained that he had expected to be able to move the slide material off the roadway by means of bulldozers, but it later developed that not very much of it could actually be moved in this fashion. However, the crucial point is that the physical conditions on which item A is based were actually anticipated by plaintiff. The circumstance that he did not correctly estimate the difficulty of coping with such conditions fails to establish a

predicate for relief under the "Changed Conditions" provision of the contract.

In his brief to the court, plaintiff also argued that, while it was true that he anticipated some slides, he did not anticipate their magnitude. However, there is nothing in the record to indicate that the magnitude of the slides was so much greater than that which could have been anticipated by the parties as to constitute a changed condition.

For the foregoing reasons, plaintiff has failed to establish any right to recovery as to item A.

### ITEM G

In this claim, plaintiff seeks $3,800 for alleged repairs of damage to the rough-graded road by logging vehicles that allegedly used the road at the direction of, and prior to its acceptance by, the Government.

In performing the clearing and grubbing work within the roadway area, plaintiff was required by the contract to convert into logs any merchantable timber and to stack the logs alongside the route of the proposed road. Defendant sold the stacked logs to the Humboldt Fir Company. Toward the end of the working season in 1958, defendant ordered the removal of the logs and made the road—which plaintiff was in the process of constructing—available for use in connection with such removal. At the time, the road had been rough-graded, but it was neither finished nor accepted for maintenance by the defendant.

The Humboldt Fir Company engaged a man named Chester Atkins to remove the logs from the project site. Atkins took his equipment to the project site and commenced the loading and hauling operations on or about October 16, 1958. This involved the use of (1) tractors to drag the logs from the stacks onto the partially constructed road, (2) a log-loader on the road to place the logs aboard trucks, and (3) large trucks to haul the logs over the partially constructed road in removing them from the project site.

Plaintiff's representative on the job registered objections with Atkins and with personnel of the defendant over the use of the partially constructed road by Atkins. It was plaintiff's position that, until the road was accepted by defendant and plaintiff was relieved of responsibility for it, defendant had no right to allow the road to be used in connection with the logging operations. However, the log-hauling operations continued until the end of the 1958 working season.

With respect to the consequences of the log-removal operations over the partially constructed road, plaintiff testified personally at the hearing before the Appeals Board and also offered three affidavits, which the Board admitted in evidence.[3]

The affidavit of W. C. Sharp, who was employed by plaintiff as a superintendent in the prosecution of the work under the contract, stated (among other things) that (1) the loading of the logs aboard the trucks obstructed the road and caused substantial delays to plaintiff's supply trucks, equipment, workmen, and general communications along the entire project; (2) the tractors used to drag the logs from the stacks to the loader tore up the road embankments and slopes, filled ditches, and scattered debris over portions of the roadway prism that had previously been completely cleared; (3) the roadbed itself was badly gouged; (4) the drainage system was blocked as a result of the logging operations, and this caused flooding during the winter shutdown season, thus causing major washouts in the roadbeds, slopes, and embankments; and (5) the partially constructed road was seriously damaged by the logging operations, causing plaintiff to incur substantial additional expenses.

3. The affidavits constitute hearsay evidence and would not be admissible in a judicial trial. However, as previously indicated, both the defendant and plaintiff have agreed that the court case may be disposed of on the basis of the evidence in the administrative record.

The affidavits of George Smith, who also served as a superintendent for plaintiff on this project, and of E. J. Killinger, who served as a foreman and superintendent, made very similar averments. In addition, the affidavit of Mr. Smith also stated that the damage to the road was repaired in June and July of 1959, under affiant's direct supervision and control, at a total cost of $3,800.

The evidence plaintiff presented to the Board indicates that plaintiff is basing this claim upon the legal theory that the defendant breached its implied obligation under the contract not to interfere unreasonably with plaintiff in the performance of the work covered by the contract.

Plaintiff's evidence concerning the consequences that resulted from the use of the partially constructed road for the loading and hauling of logs was contradicted by testimony which defendant presented through the project engineer and the district engineer of the Bureau of Public Roads. Both testified that they went to the project site and inspected the area where the road allegedly had been damaged as a result of the logging operations; that no damage had been done to the road; and that no repairs to the road were required as a result of the logging operations.

In its decision of August 24, 1964, the Department of Commerce Appeals Board found, with respect to item G, that "The evidence shows no unusual damage as a result of this [logging] operation, certainly none that made work more difficult to bring the road to final grade, which had to be done in any event." One problem in the case is to determine whether this statement, in the nature of a factual finding, which was based on the evidence summarized above and which disregarded the plaintiff's evidence previously summarized, must be accepted by the court.

■■ It will be noted that the claim comprising item G does not involve a change order (either express or constructive) that was within the scope of the "Changes" provision of the contract,[4] and it does not involve a physical condition that was within the scope of the "Changed Conditions" provision of the contract.[5] Rather, this claim is based upon an alleged breach of contract, i.e., a breach of defendant's implied obligation under the contract not to interfere unreasonably with plaintiff in the performance of the work. This is a matter as to which the Appeals Board was without authority to grant relief to plaintiff. Therefore, the Board's factual statement concerning item G, as previously quoted in this opinion, was gratuitous. As such, it is not necessarily entitled to finality under the first section of the Wunderlich Act (41 U.S. C. § 321), even though it is supported by evidence that could properly be regarded as substantial.

■ This breach-of-contract claim should be determined by the court on the basis of the preponderance of the evidence. When all the evidence pertaining to item G is considered and evaluated, it must be concluded that (1) plaintiff has established by a preponderance of the evidence that the defendant interfered unreasonably with plaintiff in the performance of the work under the contract; (2) this amounted to a breach by defendant of an implied obligation under the contract; and (3) plaintiff sustained damages as a result of this breach of contract in the amount of $3,800.

4. This provision, paragraph 3 of the General Provisions, states in part that "The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, * * * an equitable adjustment shall be made and the contract shall be modified in writing accordingly. * * * "

5. See the discussion of the "Changed Conditions" provision in connection with item A.

## ITEM H

Item H consists of a claim in the amount of $227,806.01. It is, in amount at least, the principal claim involved in the present litigation. Plaintiff asserts that the contract plans upon which he had relied in preparing his bid were seriously defective. In particular, plaintiff contends that, with respect to a number of balance areas, the plans failed to show that the quantity of earth which plaintiff was required to excavate within the several areas would be insufficient to provide the quantity of fill material which plaintiff needed for the required embankments. As a result, it was necessary to excavate more material, and to transport it for farther distances, than plaintiff had contemplated when he submitted his bid.

Plaintiff's contentions are premised upon his view that each balance area was to be regarded as separate and apart from all other balance areas with respect to the production of needed fill material from the required excavation. Thus, it appears to be plaintiff's position that if the required excavation within a particular balance area produced more earth than was needed for the required embankments within that same area, the difference represented excess material, which plaintiff was authorized to waste within the particular area, irrespective of the need for fill material elsewhere. Conversely, if the amount of earth produced by the required excavation in a particular balance area was insufficient to provide the amount of fill material which plaintiff needed for the embankments that were to be constructed within that same balance area, the difference represented a shortage of fill material. Therefore, according to plaintiff, the contract plans were deficient if they failed to show that there would be a shortage of fill material within any particular balance area. In support of this position, plaintiff relies upon a statement in the contract plans to the effect that "EXCESS MATERIAL from Roadway and Drainage Excavation shall be wasted within respective roadway balances."

It will be noted that "excess material" was to be "wasted"; and that the phrase "within respective roadway balances" modified "wasted" rather than "excess material." The syntax indicates, therefore, that the term "excess material" was not used in a severely restrictive sense with reference to the needs of a single balance area. It seems to have been the purpose of the provision to indicate that, wherever the required excavation produced earth that was not reasonably needed for the requirements of the job, which would include requirements extending over several reasonably proximate balance points, plaintiff was to waste such excess material within the same (i. e., the respective) balance areas where it had been excavated. In other words, this provision only indicates where *truly excess* material might be wasted; it does not state that any surplus of excavation over fill *within each plan balance* was excess material and could be wasted.

We note the Board concluded that the above-mentioned statement on the plans did not mean material could be wasted within the plan balances. Although the Board's decision is not binding on the court on this question of contract interpretation, we find ourselves in agreement with the Board's reasoning. The Board pointed out certain other notes on the plans which indicated that quantities and distances would change during construction. Included among those notes are the following: (1) "DESIGN CUT AND FILL SLOPES shown on the plan and profile sheets are subject to adjustment to meet field conditions"; (2) "Quantities are approximate only and are subject to increase or decrease"; and (3) "The alignment and grade as hereon shown are subject to adjustment."

The Board stated that these notes, coupled with the fact the project cross-sections were not staked at the time the bid was prepared, clearly indicated there

would be some change in the excavation and embankment quantities. This necessarily meant the design balance points would change. From the foregoing, the Board rejected plaintiff's supposition that the statement on the plans meant that no material would be taken across the plan balance points. In this connection, it is well to point out that item 24–3.1 of the specifications, entitled "Utilization of Excavated Materials," provides that:

> All suitable material removed from the excavations shall be used as far as practicable in the formation of the embankment * * * and at such other places as directed. No excavated material shall be wasted without written permission, and when material is to be wasted, it shall be disposed of as prescribed under DISPOSAL OF SURPLUS MATERIAL.

Thus, it is clear from reading the contract as a whole that plaintiff was not free to waste material within any plan balance points without regard to whether it was needed elsewhere. If this was plaintiff's interpretation, it was not a reasonable one.

Moreover, the Board's factual determinations on this issue operate to deny plaintiff's claim. The Board found that very little material was actually moved across construction balance points and that the construction balance points did not differ to any great extent from the plan balances. In fact, there was less difference between the two than would ordinarily be encountered on this type of work.

Furthermore, the Board found that the shortages which did exist between balance areas and any movement across construction balances which did occur were not caused by any deficiencies in the contract plans. Rather, they were caused by plaintiff's waste in widening the road at many places beyond the width prescribed in the contract plans. The record indicates that such action was not attributable to any directive from personnel of defendant.

The use by plaintiff of excavation material to widen the road beyond the width prescribed by the contract caused shortages to develop in connection with the fill material that was needed for the completion of the required embankments within various balance areas. It also necessitated the hauling of fill material for greater distances than would otherwise have been necessary.

■ We find substantial support in the record for the Board's determinations, particularly in defendant's quantity sheets. These sheets (compilations of the embankment and excavation in the construction derived from actual cross-sections of the work) showed that plaintiff had an excess of excavation over embankment needs in the great majority of the balance points. Although plaintiff contends that defendant deliberately attempted to disguise defects in the plans by conscious misrepresentations in the quantity sheets, this allegation of fraudulent conduct on the part of defendant is not supported by the record.

■ As the Board noted, any additional movement caused by plaintiff's unauthorized use of excavated material is not a compensable item. Excavation is to be paid for the amount of material excavated in conformity with the plans, and overhaul can only be paid for when required by the design or ordered by the defendant's engineer. For these reasons, the Board held that plaintiff had been correctly paid.

In a related finding, the Board rejected plaintiff's complaint that defendant had failed to complete an after-construction survey. The Board stated that such a survey would have been of little value, because payment depended solely upon work necessary to build the road according to the plans and would have been unaffected by any unauthorized work performed by plaintiff. The Board also noted that the weathering of the slopes would make such a resurvey unreliable.

■ From an examination of the record, we conclude that all the above factual determinations of the Board are

supported by substantial evidence. Therefore, such findings are final under the standards of the Wunderlich Act, 41 U.S.C. §§ 321–322; United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S. Ct. 1409, 10 L.Ed.2d 652 (1963), and plaintiff has failed to establish any right to recovery as to item H.

 Even where the predominant issue of a claim is one of law, such as the interpretation of contract provisions, the findings of a contract appeals board as to facts directly related to the legal issue are accorded finality under the Wunderlich Act, as long as the claim is one upon which the board could grant relief under the contract. Morrison-Knudsen Co. v. United States, 345 F.2d 833, 170 Ct.Cl. 757 (1965).

 Despite plaintiff's arguments to the contrary, the Board could have given relief on this claim. The essence of plaintiff's claim is that it was necessary for him to excavate more material, and transport it for farther distances, than called for by the plans. If this were true, the Board could have awarded plaintiff an equitable adjustment for a constructive change under the "Changes" clause. As mentioned in footnote 4, supra, that clause provides that the contracting officer may "make changes in the drawings and/or specifications of this contract," and that an equitable adjustment shall be made if such changes cause an increase in the amount due. Thus, the contracting officer could have ordered a change in the plans to make them conform to the amount of excavation and overhaul plaintiff contends occurred. This court has often recognized the ability of a contract appeals board to grant equitable adjustments under the "Changes" clause because of mistakes in the plans somewhat similar to the alleged mistakes in the plans in the instant case. See, e.g., Jefferson Constr. Co. v. United States, 364 F.2d 420, 425, 176 Ct.Cl. 1363, 1371 (1966), cert. denied 386 U.S. 914, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967); Morrison-Knudsen Co. v. United States, supra.

 The court also rejects plaintiff's contention that the decision of the Board is not entitled to finality because of the Board's denial of admissibility of certain documents for pretrial discovery and because of the Board's failure to make findings on material issues of fact.

At the pretrial conference held by our trial commissioner, plaintiff's counsel reserved the right to contend that plaintiff was arbitrarily and capriciously denied access to certain specified documents for discovery purposes during the course of the administrative proceedings. Subsequent to the pretrial conference, counsel for defendant supplied some of the specified documents to plaintiff's counsel and reported that the others could not be located. However, there is nothing to indicate that the missing documents, if available, would affect the outcome of the litigation.

 As to the Board's purported failure to make findings, an examination of the Board's opinion shows that it is replete with material factual conclusions, many of which have been recounted in this opinion. It is true that these factual conclusions were included in the text of the Board's opinion instead of being separately numbered and labeled as "findings," but this gives plaintiff no cause for complaint. This is quite often the procedure adopted by administrative boards, and it contravenes no rule of law of which we know. Moreover, it is impossible to see how this could prejudice plaintiff in any way.

SUMMARY

For the reasons indicated, plaintiff's motion for summary judgment, with respect to item G, is granted; defendant's cross-motion for summary judgment with respect to that item is denied; and judgment is entered for plaintiff in the sum of three thousand eight hundred dollars ($3,800) on this claim.

As to items A and H, plaintiff's motion for summary judgment is denied; defendant's cross-motion is granted; and that part of the petition is dismissed.

DAVIS, Judge (dissenting in part):

I join the court's opinion on Items A and H but disagree as to Item G. In its discussion of Item H the court recognizes the established principle that "constructive changes" fall under the standard changes article. With respect to Item G, the defendant's directive that the road be made available to Atkins and the Humboldt Fir Company seems to me to have been clearly such a "constructive change". Assuming that under the contract as originally drafted the plaintiff had the right to full control of the road until its completion, the Government's instruction that the road be opened for log-removal was a change in the specifications calling for an equitable adjustment under the changes clause. This was the most typical of "constructive changes"—despite its protests, the plaintiff was told to alter its intentions and to do things differently from its original expectation under the plans and specifications. See WRB Corp. v. United States, 183 Ct.Cl. ——, Slip op. at 4–5 (April 1968). On this view, the Board could grant relief "under the contract" and its factual findings must be accepted if adequately supported. As the court concedes, there was substantial evidence to sustain the administrative determination, and therefore I would dismiss Item G along with the other two.