**CHARLES T. PARKER CONSTRUC-TION COMPANY and Pacific Concrete Company**

v.

**The UNITED STATES.**

No. 168–66.

United States Court of Claims.

Nov. 13, 1970.

Gilbert A. Cuneo, Washington, D. C., attorney of record, for plaintiffs. James C. Maletis, Cookingham & Maletis, Portland, Or., W. Stanfield Johnson, Charles E. Yonkers, and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON PLAINTIFFS' AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Louis Spector with directions to prepare and file his opinion on the issues of plaintiffs' motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on January 9, 1970, wherein such facts as are necessary to the opinion are set forth. Plaintiffs filed a request for review by the court pursuant to Rule 54(b) (3), defendant requested that the court adopt the commissioner's opinion and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.

On this request for review of the trial commissioner's opinion and recommended conclusion, plaintiffs renew the charge that the determination of the Commerce Department's Board of Contract Appeals was tainted by so-called ex parte communications and by the failure to order the production of the diary and record of the Project Engineer. For the reasons given by the trial commissioner in paragraphs 1–6 of his order of April 30, 1968, denying plaintiffs' motion for *de novo* review of the administrative record (which order the court declined to overturn on June 14, 1968), the court now holds that these charges do not warrant the characterization of the Board's findings and determination as arbitrary, capricious, or unsupported by substantial evidence.

Since the court agrees with the opinion and recommended conclusion of the trial commissioner, as hereinafter set forth, it hereby adopts the same, together with the foregoing paragraph, as the basis for its decision and judgment in this case. Therefore, plaintiffs' motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and the petition is dismissed.

## OPINION OF COMMISSIONER

SPECTOR, Commissioner: This case is founded on a contract between plaintiffs (a joint venture comprised of the above named companies, hereinafter Parker-Pacific), and defendant acting through the Department of Commerce, Bureau of Public Roads. The contract dated December 9, 1959, was in the original amount of $870,069 and called for construction of the so-called Cascade Wagon Road (2.336 miles of graded road), being part of the Washington Forest Highway (Project 32A), Mt. Baker National Forest in Whatcom County, State of Washington.

Parker-Pacific seeks judgment of $207,862.89 in the form of an equitable adjustment for "changed conditions" allegedly encountered within the contemplation of the standard contract provision bearing that title.[1] The claim is the second (and by far the larger) of two claims [2] which have heretofore been the subject of administrative consideration pursuant to the standard "Disputes" article contained in the contract.[3] The judicial remedy is therefore limited by the terms of that article, which is worded

1. "4. CHANGED CONDITIONS
    "The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; provided that the Contracting Officer may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final

settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof."

2. The first, in the original amount of $9,777.26 for "clean-up," was presumably abandoned after denial by the agency, and is not mentioned in the petition filed with the court.

3. "6. DISPUTES
    "Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall furnish to the Contractor a written copy of his decision. Such decision shall be final and conclusive unless within 30 days from the date of receipt thereof, the Contractor appeals therefrom by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary. The decision of the Secretary or his duly authorized representatives upon such appeal shall be final and conclusive unless the

to comply with the so-called Wunderlich Act.[4]

There have been extensive proceedings initiated by plaintiffs to persuade the court that the agency decision on this claim is not entitled to any degree of finality because of alleged defects in the procedures underlying it. The defects alleged were, in the main, ex parte communications between agency personnel, some of whom were members of the part-time appeals board authorized to represent the Secretary in deciding the contractor's appeal. The ex parte communications had been developed following extensive depositions of these agency personnel by plaintiffs. Plaintiffs' motion for de novo review of the administrative decision on these grounds was denied by trial commissioner's order of April 30, 1968, on the basis of the Supreme Court's decision in United States v. Carlo Bianchi & Co.[5] That order concluded:

> Without delving into the merits of the case, the record filed with the court appears to be a substantial and conventional one. It is comprised of four volumes of testimony supported by a file of exhibits, and three additional volumes of material, all addressed to the issues in this case. There is a decision of the Department of Commerce Appeals Board, purporting to deal with the issues presented. If, upon review, this court determines that the Board's decision is one on a question of law, or on a mixed question of law and fact in which the law ingredient is paramount, its review of the Board's decision will in fact be *de novo*, and this motion would be purely academic.

On the other hand, if it develops that the court is essentially confronted with a decision concerning a question of fact, the standards of review adopted in the Wunderlich Act are for application, that is, "arbitrary," "capricious," and "not supported by substantial evidence," as measured against the administrative record.

\*   \*   \*   \*   \*   \*

In summary, then, this is an administrative decision on a claim clearly within the coverage of the "Disputes" clause, and redressable under the "Changed Conditions" article of the contract. \* \* \* Accordingly, the court is obliged, initially at least, to review that decision utilizing Wunderlich Act criteria measured against that administrative record.

Plaintiffs' request for review of the trial commissioner's order was denied by the court June 14, 1968, and the parties thereafter filed cross motions for summary judgment pursuant to Rules 94–100.[6]

*Summary of the Agency Proceedings*

The nature of this claim, and of the Government's response thereto, has changed somewhat in the course of its development. In its original announcement of the claim by letter of July 18, 1961, Parker-Pacific stated:

> This claim is based on the increased cost of performing items 102(1), 105(1), and 105(2) [7] of the contract on account of unknown physical conditions at the site, of an unusual nature, differing materially from those

---

decision is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. In connection with any appeal proceeding under the 'Disputes' clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision."

4. 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1964 ed.).

5. 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

6. Now Rules 161–168, as revised September 1, 1969.

7. This is a unit price (estimated quantities) contract. Item 102(1) calls for "Unclassified excavation" of an estimated 360,000 yards at $1.30 per yard. The other two relatively unimportant items deal with "Overhaul."

ordinarily encountered and generally recognized as inhering in work of the character provided for in the foregoing contract items.[8]

Prior to submitting its bid, the contractor conducted a site investigation which revealed that the rock had brownish cleavage faces in certain locations indicating that it might be ripped or at least be softer and cheaper to drill than the gray and more solid rock. In the vicinity of Station 112 +00, the exposed rock outcrop was of a dice formation of less than a 12" cube in size which would normally break on blasting to the same size. Actually this formation changed immediately beneath the surface and the material broke to sizes as large as 15 cubic yards. Fault lines which were not in evidence from a visual inspection of the surface resulted in overbreak, causing loss of many pre-drilled holes in the cut in the vicinity of Diablo Dam. Widely spaced cleavage planes with many changes in direction made necessary much secondary shooting and expensive handling costs through the rock sections with the exception of the most easterly cut.

The nature and formation of the rock, as stated, resulted in a greatly increased cost of performing the named items of the contract and were unknown both to the contractor and the Government at the time the contract was let. These conditions had not been encountered previously by any of the engineers of the contractor in performing this type of work throughout the Northwest over a period of many years. Since this was the first contract let on the westerly side of the Cascades by the Bureau of Public Roads, information secured by the contractor as to the nature of the rock to be encountered proved erroneous.

The attention of the Government Engineers was drawn to these unusual conditions immediately when they were encountered by the contractor, but it was impossible to determine the full nature and extent of these conditions and the additional cost of performing these items of the contract on account of these conditions, until the work had been completed. The contractor is now in process of completing an analysis of the actual cost of performing these items in the contract. A tentative analysis indicates that the actual cost of performing these items was increased in the amount of $207,-862.89 over the estimate made by the contractor in preparing its bid, on account of the unusual conditions as set forth herein. An itemized breakdown of the actual cost will be furnished to the Government in substantiation of this claim after final verification of the figures has been completed.

In acknowledging receipt of the above claim, the contracting officer noted the absence of the notice required by the "Changed Conditions" article, but waived timely notice because "the record indicates that our engineers had knowledge of the difficulties which you were experiencing in excavating the rock * *."

Detailed support for the claim in the amount of $207,862.89 was thereafter furnished by letter of August 10, 1961. The contracting officer's formal decision thereon is dated March 5, 1963, and denies the claim simply on the grounds that:

* * * The removal of material from the roadway prism was specified to be on an unclassified excavation basis, the bid was solicitated [sic] on that specification and the contract clearly provides for that manner of measurement and payment. There is no authority under the terms of the contract to make payment on any other basis.

This decision was promptly and timely appealed. After protracted and abor-

8. As can be observed from a reading of the "Changed Conditions" article, this is a reference to "category two" changed conditions, often thus described because they are the second type of conditions mentioned in that article.

tive settlement efforts, the parties proceeded to present the issues to the aforementioned part-time ad hoc appeals board representing the Secretary. Appeal briefs, so-called, served the function of pleadings before the board.

It appeared therein that plaintiffs had changed the original theory of their claim from one concerned with the cleavage characteristics of the rock, to one complaining of the hardness and abrasiveness of the rock, and its effect upon drilling costs. Blasting of rock, of course, requires extensive drilling of holes for the explosives, and to control the point at which breakage takes place.

Relying on this change in theory, counsel representing the Government before the board revived the "lack of notice" which had been waived by the contracting officer, and now asserted that the contracting officer had received no notice of "Changed Conditions" predicated on this new theory of "hardness and abrasiveness" of the rock. Decision on that notice issue was deferred pending a hearing on the merits, which was held September 14 through 18, 1964.

The proof offered before the board can be summarized as follows. Plaintiffs claim that an unknown and unusual condition was encountered in the form of "a very large amount of garnet gneiss containing a very large percent of garnet * * * [resulting in] substantial, additional costs in its blasting and drilling operations * * *." Mr. Jack Parker, civil engineer, conducted a prebid site investigation with Mr. Al Vala of his company and Messrs. Otis P. Jordan, Jr., and Wayne Lowell of the other joint venturer. He walked over the area and concluded it was a typical "rock job." Mr. Otis Jordan, also an experienced engineer, testified that "while the pioneering or accessibility was rougher than, you might say than usual. The rock itself would be drillable, shootable, and would load at a little higher than average rate." Mr. Al Vala, Vice President of Parker and an experienced engineer, testified as to difficult access to the job site in this rocky, mountain area, the am-

ple opportunity to examine large rock faces and outcroppings, and how he tested the hardness of the rock with a knife, and by striking pieces together.

He concluded: "It was soon evident that the major part of the work was solid" and that it was an "ordinary rock job."

On the unit price schedule, providing an opportunity for bidders to quote a separate price for each major classification of work to be performed, plaintiffs bid $1.30 per cubic yard for the unclassified excavation embracing this rock removal. The contract was awarded, of course, on the basis of the total bid submitted, but plaintiffs direct attention to the fact that the next three low bids submitted for this item of work were $1.27, $1.39½ and $1.56; and that the Government's estimate for the item was only $1.35. This is offered to show that plaintiffs' estimate for this phase of the work was "in line," and to rebut any suggestion that an inordinately low bid provides the explanation for plaintiffs' losses.

After the work commenced, however, it was found that the rock was "extraordinarily hard and abrasive," that it did not drill at the speed contemplated, and that drill bits had to be changed quite often "due to the fact that [they] were wearing out so fast." A drilling rate of 20 feet per hour was achieved rather than the 50 feet per hour anticipated.

One of plaintiffs' attorneys testified before the board that Mr. Neil Eplin, the Government's Project Engineer, allegedly advised him that the difficulties encountered were not due to plaintiffs' negligence, but were due to the hardness of the rock. Mr. Eplin was not asked to testify at the board hearing, and this was one of the factors cited in support of the above-mentioned motion by plaintiffs "for de novo review." It is also urged now, as detracting from the substantiality of the evidence underlying the board's decision.

As its expert witness, plaintiffs presented a well qualified geologist, Dr.

Bates McKee. He had been called in, after the fact, to see if he could ascertain the cause of the difficulties which had been encountered, and whether they were unusual. Dr. McKee mapped and walked over the site, examining the rock faces. He took samples and photographs within and outside the project area, and made microscopic examinations of thin sections of the samples which he then studied. He tried, in consultation with others, to develop a test showing the relative difficulty of drilling garnet gneiss, but was unsuccessful.

Dr. McKee testified that in his opinion it was unusual to find garnet gneiss in this area, and that it was further unusual in the amount of garnet present in this garnet gneiss, namely, 5 to 10 percent, whereas it was normal to expect 5 percent garnet. He did not think it would be recognized on visual examination by most contractors, but rather that it would take a geologist to identify it. He thought its presence explained the trouble plaintiffs had encountered in drilling.

Before the board of contract appeals, defendant's response to the foregoing was that plaintiffs failed to give the required notice of this changed condition, as required by the contract article, because this new theory was an afterthought, developed by Dr. McKee 2 years after completion of the project. The Government also presented experts. An expert in mining geology, Mr. Robert Miller, testified that he and a Mr. Paone, a mining engineer, examined the project area and adjoining areas together by walking the site and preparing a map. They took extensive samples and photographs, and together prepared a comprehensive report which was introduced as Government exhibit C before the board. They concluded that the predominant rock type in the general area was a quartz diorite gneiss. There were variations and secondary types of rock. These experts concluded that geologically speaking there was no "Changed Condition" since the rock type and structure were the same in the project area as in the general surrounding area, and therefore were not unknown, unusual or materially different from those ordinarily encountered and readily observable.

Mr. Paone, specifically as a rock drilling expert, ran a number of drillability tests. After extensive, detailed testimony, this witness concluded that the rock was essentially the same both inside and outside of the claim area, taking into consideration strength and elasticity, hardness, density and abrasiveness. He further concluded that "the rock would drill essentially the same inside and outside of the claim area." This was based on an examination extending as far as 15 to 20 miles from the claim site.

This witness also took issue with the plaintiffs' conclusion that difficulties had been encountered, pointing out that they achieved about the rate of drilling he would have expected in this type of rock. He testified: "I am not so sure this is a difficulty, sir. I wonder what penetration rates the other contractors in similar rock type were getting. I would venture to say these other contractors operating in this type of rock are not getting excessively greater footages per hour than the contractor got in this particular case. * * * I think it is just a hard rock. Had he drilled into granite, undoubtedly he would have gotten a slower penetration rate there."

Referring specifically to a garnet zone, he stated: " * * * I am not sure of the garnet percentage here, but it must have been over five percent, for us to use that name. We got a higher penetration rate here than the average. So the garnet did not appreciably slow down the penetration rate. The hardness of garnets are approximately the same hardness as the quartz, and we saw evidence today in the slides of many quartz stringers in the rock."

A Mr. James Kernoul, a grade inspector on this project, offered the opinion that Parker-Pacific's drilling rate was slowed by reason of its election to drill the full depth of a cut, sometimes as deep as 80 feet, using the same bit for

the full depth of the hole. He stated that "30 feet is the maximum that anybody else would be apt to go, but after 30-foot, the bit would be dull and you would lose your penetration."

On the basis of the record very briefly summarized above, the appeals board concluded that Parker-Pacific's claim of "Changed Conditions" could not be sustained, and its appeal was denied. The opinion underlying this decision can be briefly summarized as follows: First, it rejected the defense of untimely notice of the claim, a matter which had been originally rejected by the contracting officer, and revived by Government counsel before the board after plaintiffs changed the theory of their claim.

Turning to the merits, the board concluded that plaintiffs had established they had conducted an adequate prebid site investigation and had encountered drilling difficulties, "but to some extent the Government raised a question as to the personnel, equipment and, particularly, the operating techniques which the Contractor used." The opinion then cites the expert testimony offered by both sides on the nature, extent and effect of the rock and concludes that the testimony on both sides was in accord with respect to the geology of the area, "particularly as to the presence of garnet and garnet gneiss as well as more common granitic gneiss. In the main their testimony differed only in respect to the significance of this garnet presence in relation to the contract work. Dr. McKee expressed the opinion that it was unusual and was responsible for the Contractor's drilling and shooting difficulties and excess costs; and the testimony of Messrs. Paone and Miller was to the opposite effect."

The board preferred the Government's testimony on that issue. It observed that Dr. McKee claimed no drill-ing or blasting expertise, and that he acknowledged that other forms of rock common to the area were also hard and abrasive. It found the Government testimony more specific, comprehensive and "most impressive." As to the failure of the Government to present its Project Engineer, the aforementioned Mr. Neil Eplin, the board pointed out he was not a geologist, that he was present throughout the hearing, and could have been called by the contractor, if desired.[9]

There is a discussion in the administrative opinion of the fact that a number of bids for this work item exceeded this contractor's by as much as 50 percent to 70 percent, that the bid may have been unbalanced, and that presented a "possible explanation of the Contractor's alleged losses on the 'unclassified excavation' item here involved." The opinion concludes:

> To sum up—it is necessary under clause 2 of Article 4 of the Contract to find not only that materials were encountered that would constitute a changed condition as defined therein, but also that the Contractor's costs were thereby increased. On the basis of the evidence in the record before us, as hereinabove summarized and analyzed, we cannot make such a finding, and therefore, Contractor's claim (2) must be and is hereby denied.

As provided by the contract between the parties [10] the foregoing decision, to the extent that it is addressed to a dispute concerning a question of fact, is final unless "fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." That test necessarily confronts the court with the age-old problem of determining whether the board's decision concerns a question of fact, or one of law. "When,

9. The agency opinion notes that it did not consider relevant Eplin's possible testimony, nor his failure to testify. Earlier in the hearing, the board had denied the contractor's request to examine Eplin's job diaries and notes "indicating, however, that such records would be made available to the contractor when and if the Project Engineer were called as a witness."

10. See note 3 supra.

as most often occurs, the decision concerns an inextricably mixed question of law and fact, it is presumably necessary to determine whether the fact or the law ingredient is central and crucial to the decision, because of the contrasting finality tests applicable to each." [11]

The agency decision in this case entails to some extent an interpretation of the "Changed Conditions" provision of the contract.[12] "Category two" changed conditions necessarily involve application of the terms of art [13] contained in the second portion of the "Changed Conditions" article, to the physical conditions present in the case so that the matter "falls on the side of the decisions open to judicial review as interpretations of contract language or as establishing criteria for the application of contract standards." [14]

That interpretation necessarily grows out of factual roots. What were the recognized and usual physical conditions at the site of the work? What physical conditions were actually encountered? Did they differ from the known and the usual? If so, did they cause an increase in the cost of performance?

A Government construction contractor seeking to establish a "category two" changed condition is confronted with a relatively heavy burden of proof. In the case of a "category one" changed condition, the Government has, with relative precision, represented the subsurface or latent physical conditions to be encountered, and if it turns out that they have been materially misrepresented, a claim has been established. Under "category two," in contrast, the Government has elected not to presurvey and represent the subsurface conditions [15] with the result that a claimant must demonstrate that he has encountered something materially different from the "known" and the "usual." This is necessarily a stiffer test because of the wide variety of materials ordinarily encountered when excavating in the earth's crust.[16]

The agency decision found that hard, abrasive rock was generally recognized and usual in this geographical area; and that hard and abrasive rock is precisely what the plaintiffs encountered. It further found that Parker-Pacific's claimed costs were not causally related to the discovery of unknown and unusual physical conditions "differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract." In addition to the expert testimony offered by the Government, it is observed that "gneiss" is generally defined as a "laminated or foliated metamorphic rock, corresponding in composition to granite or some other feldspathic plutonic rock"; and "garnet" is defined as a "hard, brittle, glass like mineral, occurring massive and in grains, and *common in gneiss* and in mica schist." [17] [Emphasis supplied.]

11. Ray D. Bolander Co., Inc. v. United States, 186 Ct.Cl. 398, 405 (1968).

12. See note 1 *supra.*

13. " * * * *unknown* physical conditions at the site, of an *unusual nature*, differing *materially* from those *ordinarily* encountered and *generally recognized as inhering in work of the character provided for in this contract.*" [Emphasis supplied.]

14. National Steel & Shipbuilding Co. v. United States, 419 F.2d 863, 874, 190 Ct.Cl. 247, 265 (1969); United Contractors v. United States, 368 F.2d 585, 595–596, 603, 177 Ct.Cl. 151, 162, 174 (1966); Kaiser Indus. Corp. v. United States, 340 F.2d 322, 333–334, 169 Ct.Cl. 310, 330 (1965).

15. Although this may result in higher contingency factors and therefore uniformly higher bids. *Cf.* Ruff v. United States, 96 Ct.Cl. 148, 164 (1942).

16. *See* S.T.G. Constr. Co. v. United States, 157 Ct.Cl. 409 (1962), also Wm. A. Smith Contracting Co. v. United States, 412 F.2d 1325, 188 Ct.Cl. 1062 (1969). This definition is, therefore, more readily applicable when the contractor encounters an artificial or man-made obstruction, totally unexpected by both parties. *Cf.* Lyburn Constr. Co., ASBCA 9576, 65–1 BCA ¶ 4645; Concord Water Supply Co., ASBCA 5402, 60–1 BCA ¶ 2494.

17. Webster's New Collegiate Dictionary (1960).

The failure of the Government to present its Project Engineer, Neil Eplin, is not material. He had testified earlier on the smaller claim, above-mentioned, and was present at the hearing for presentation by plaintiffs, if desired. It is argued that he would have testified as to the severe difficulties encountered by plaintiffs, but those severe difficulties are acknowledged. The gist of the agency decision is that they were not unknown, nor unusual, and that they are generally recognized as inhering in this type of work.

All of the foregoing considered, it is concluded that the agency's decision concerning ultimate questions of fact is amply supported by substantial evidence,[18] and that it is, moreover, correct in its interpretation and as a matter of law. Plaintiffs are therefore not entitled to recover.[19]

## CONCLUSION

Plaintiffs' motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.

18. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

19. Cf. Clack v. United States, 395 F.2d 773, 184 Ct.Cl. 40 (1968) ; Ace Constr. Co. v. United States, 401 F.2d 816, 185 Ct.Cl. 487 (1968) ; Carlo Bianchi & Co. v. United States, 167 Ct.Cl. 364 (1964), cert. denied, 382 U.S. 841, 86 S.Ct. 32, 15 L.Ed.2d 82 (1965).