**A.D. and G.D. FOX, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 363–81C.**

United States Claims Court.

Dec. 19, 1984.

---

Joseph A. Yazbeck, Allen & Yazbeck, Portland, Or., for plaintiffs.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., with whom was Allen C. Peters, Elden M. Gish, and Linwood C. Wright, Jr., Washington, D.C., for defendant.

ON CROSS–MOTIONS FOR
SUMMARY JUDGMENT

OPINION

SPECTOR, Senior Judge.

This action arises out of a contract for construction of the so-called Wagner Gap

Road in the Rogue River National Forest, Jackson County, Oregon. Plaintiff[1] was awarded the contract by the Forest Service, U.S. Department of Agriculture in the original amount of $974,045.15. The work, to be completed in about a year, consisted of construction of 8.42 miles of road in a wilderness area, including all necessary clearing and grubbing, excavation, embankment and compaction, installation of corrugated metal pipe, and placing of base course rock.

Seven claims arising out of the project were appealed to the Department of Agriculture's Board of Contract Appeals (AGBCA) following adverse decisions thereon by the contracting officer in the Forest Service. These appeals are generally described, in defendant's brief, as follows:

1. Class I, Differing Site Conditions. Excess costs relating to item 51(1) of the contract, unclassified excavation.

2. Excess costs in developing the Little Applegate Quarry.

3. McDonald Creek Excavation (shooting and blasting subsurface rock).

4. Engineering errors and delays.

5. Excess costs relating to item 50, clearing and grubbing.

6. Underpayment for contract item 209, including porous backfill material.

7. Underpayment for item 151, watering.

All of these appeals were denied by the AGBCA except No. 6, above. Plaintiff sought judicial review of the Board's decision on Nos. 1, 3, 4 and 5, above, and abandoned No. 5 after filing of the petition herein. The Board's decision on the remaining three appeals (Nos. 1, 3 and 4) is before the court for review, measured against the standards set forth in the so-called Wunderlich Act.[2] They are hereinafter reviewed in that order.

1. The individual plaintiffs comprise a partnership, hereinafter referred to in the singular.

2. 41 U.S.C. §§ 321–322.

*No. 1—Differing Site Conditions*

*Statement of Facts*

General Provision 4 of the contract provides in pertinent part as follows:

"4. Differing Site Conditions

(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) Subsurface or latent physical conditions at the site *differing materially* from those *indicated* in this contract .... The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions *do materially so differ* and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly." (Emphasis supplied).

Plaintiff claims that it encountered unanticipated solid rock when excavating between stations 166 and 172 along the alignment of the road. Rock and boulders had been anticipated, but the contractor contemplated that the cut could be made by ripping any rock encountered and without the need for drilling and blasting.

■ The Forest Service did not purport to directly represent the nature of the material to be excavated. It is described in the contract as "unclassified" excavation, "regardless of the nature of the material excavated." In the absence of a specific representation in the contract documents regarding the subsurface conditions to be encountered, plaintiff is obliged to rely instead on the cumulative effect of indirect or implied "contract indications which led (us) to believe that the subsurface material would be common."[3]

3. Quotes are from plaintiff's motion papers, unless otherwise indicated.

■ General Provision 13 of the contract provides in pertinent part as follows:

> Conditions Affecting the Work. The Contractor shall be responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof. Any failure by the Contractor to do so will not relieve him from responsibility for successfully performing the work without additional expenses to the Government. . . .

The contractor states that it made "two meticulous prebid investigations of the site." It offered testimony before the board that "despite the presence of these boulders, Gary (Fox) believed that he would be able to accomplish the cut with a caterpiller (sic) tractor." This belief was based on inferences which plaintiff drew from three design factors which did not purport to directly describe the type of material to be excavated. Those design factors are (1) compaction factors calculated from the excavation quantities within the balance points, (2) back slope ratios along the road, and (3) the presence at one point of a grouted rip rap headwall.

Compaction factors are derived by dividing the amount of excavation by the amount of embankment between the balance points shown on the plans. The significance of the compaction factors is that the ratio thus derived indicates whether the excavated material will shrink or swell when excavated and then compacted in the embankment. For example, a 1.5 compaction factor would indicate 50% more excavation than embankment, or a 50% shrinkage in the embankment. Common material (soil) ordinarily shrinks when excavated and compacted in embankment, while rock (whether ripped or blasted) would swell when placed in embankment. The predominant compaction factor along the entire Wagner Gap road was greater than 1, suggesting average shrinkage, which plaintiff interpreted as meaning that the excavation therefore involved common material, and not rock.

The second design factor which plaintiff cites was the backslope ratios. These are generally steeper for rock cuts, less steep for stable non-rock material, and flatter for unstable material. For example, a backslope of one-half to one would describe a steeper slope than one to one. The backslope ratios for this road were three-quarters to one, except for a short section which was one-half to one. Plaintiff concluded from this that the excavation would for the most part be through common material, with some rock which would be rippable.

Finally, the contract called for placement of a grouted rip rap wall up the backslope at station 170 plus 12. Plaintiff believed that this was designed to protect the embankment from deteriorating, thereby suggesting common material at this point. When rock was later encountered, the grouted riprap headwall was deleted by the Forest Service.

Plaintiff discounts the rock outcroppings admittedly observed during its "two meticulous prebid investigations of the site," because it also observed what it describes as "deep rooted" trees indicating the rock was not solid. In addition, plaintiff draws attention to a notation in the resident engineer's diary prior to the commencement of construction, in which the resident engineer appears to be more concerned with the possibility of soil erosion between stations 169.5 and 171.5, than with the possibility of encountering hard rock. That diary note does, however, also describe the material to be excavated as "large boulders and decomposed granite."

Based on the evidence presented to it, the AGBCA found as a fact, and concluded as a matter of law, that in "mountain country in cuts from 20 to 30 feet, the possibility of running into hard rock is substantial." It further concluded that balance points may not be relied upon as the sole indication of materials to be found because compaction factors are a composite of all the material between the balance points. Thus shrink and swell factors were averaged in arriving at balance points for the

larger area between stations 165 and 241,[4] and even those balance points indicated rippable or hard rock between stations 171 and 202, and between 165 and 171.

Nor, in the board's opinion, are the backslope ratios a valid criterion. Steeper backslopes indicate material that can stand on a steeper slope than common material, and highlight the need for careful examination of those locations.[5] The grouted rip rap wall, it concluded, may indicate material that might erode over a period of time but "it does not necessarily indicate common material."

The board alluded to the testimony of plaintiff's own expert witness, that he would expect boulders, ridges or rock outcroppings and not "a volume of solid rock," but that there might be a percentage that would require blasting. The Government's photographs of these rock outcroppings would, in the opinion of plaintiff's expert, dictate caution.

In its opinion, the board places heavy reliance on plaintiff's own observation of rock outcroppings prior to bidding, characterizing this as "an automatic warning system."

Another previously constructed road, parallel to the one constructed under this contract, is cited by both parties to support their respective positions.[6] The board observed that a "number of instances of hard rock are apparent along (parallel) road 3962A." It noted nearly 40 such instances of rock outcrops varying from hard to decomposed rock, and numerous instances of rock observable above the cuts necessary to construct this Wagner Gap Road. Some of the photographs introduced showed rock above the road cut at stations 168 and 172, which are within the area of this claim. Other photos show rock in Jim Creek 30 feet and 50 feet above the cut for this road, around station 170.[7]

*Discussion*

This claim is addressed to the earlier quoted General Provision 4, "Differing Site Conditions",[8] which has historically been recognized as a provision to discourage contingencies in bids. In applying that provision to the myriad factual circumstances in which is cited, it has always been helpful as a starting point to reaffirm its contingency-eliminating purpose. Where prospective bidders cannot know what material is to be encountered in the subsurface, and where each cannot be expected to undertake an independent, time-consuming, and costly engineering survey of subsurface conditions,[9] the Government can do so for all prospective bidders, prior to advertising for bids. It can then portray its findings in the advertised contract documents for the information of all prospective bidders. In this way it is obliged to pay only if more difficult and costly conditions are encountered than those indicated or portrayed in the advertised contract documents. In the alternative, the Government can of course elect to make no representations whatever with respect to subsurface conditions, thereby running the risk that bidders will include contingencies in their bids to compensate for costly unknown con-

---

4. Note that this claim involves only the area between stations 166 and 172.

5. As noted earlier, the backslope ratios were three-quarters to one, except for a short section which was one-half to one. These are not inconsistent with rock excavation.

6. The separation of the two roads varied from a few feet to .75 mile.

7. Plaintiff's response to the evidence of rock along the older parallel Road, 3962A, is that he was informed by local loggers and by that contractor's superintendent that the older road was built with a "Cat", with no drilling and blasting, although his site investigation revealed some blasting was done in the area of stations 166 to 173. One of the plaintiff-partners also testified that he had previously constructed another road about 5½ to 6 miles from the road constructed under this contract, and was obliged to drill and blast only 25 to 50 yards of rock, the rest of the roadway being excavated using a compressor and jack hammer.

8. In the past entitled, "Changed Conditions."

9. Each bidder might, in addition, arrive at a different conclusion, thereby eroding the integrity of the competitive bidding process.

ditions, which may never in fact be encountered.

This statement of underlying purpose was made in *Ruff v. United States*,[10] as follows:

> ... If this situation is not within the contemplation of Article 4, the alternative is that bidders must, in order to be safe, set their estimates on the basis of the worst possible conditions that might be encountered. Such a practice would be very costly to the defendant. We suppose that the whole purpose of inserting Article 4 in the defendant's contracts was to induce bidders not to do that.

This "Differing Site Conditions" case presents a close issue because we are not afforded the luxury of a clear and direct portrayal of the subsurface conditions to be encountered as would be the situation, for example, where pre-bid borings had been made by the Government and logged on the drawings, for comparison with conditions actually encountered. Here, in contrast, we have a statement which does not purport to make any representation with respect to the subsurface. Instead there is a negative description of the excavation as "unclassified ... regardless of the nature of the material excavated." But there are also "indications" from which plaintiff infers that any rock encountered would be rippable with a Cat, without the need for drilling and blasting.

The issue then, taking into consideration the above-outlined purpose of the "Differing Site Conditions" article, is whether or not those indirect "indications" placed the risk that solid rock might be encountered in one section of the job on the prospective bidders (with the costs to be included in their bids); or in the alternative that the Forest Service assumed that risk instead, represented that no solid rock would be encountered, and agreed to pay only if solid rock was in fact encountered.

It is concluded that plaintiff drew too rosy a picture from the "indications" upon

which it relies, while at the same time giving too little weight to contrary "indications" represented by the outcroppings of rock clearly visible on any reasonable site investigation. Put in another way, a reasonable, prudent contractor and bidder in these circumstances would not have assumed that no solid rock would be encountered, and that if it was unexpectedly encountered, that the Forest Service would pay for the additional cost of its removal.

As the AGBCA opinion observes, this is mountain country where rock outcroppings were readily observable from a site examination of surface conditions, both along this road and the older and roughly parallel road. Where the contract requires 20 to 30 foot cuts in that type of terrain, the possibility of running into sections of hard rock cannot so readily be discounted.[11] Plaintiff also exaggerates the importance of the contraindications on which it presumably relied. Compaction factors were *averaged* over a larger area than involved in this claim. It is thus entirely possible to compute an average of compaction factors which would not negate the prospect of encountering hard rock in part of the area being averaged.

The backslope figures similarly fail to negate the possibility of hard rock. The designed backslopes were relatively steep, and not inconsistent with those encountered in rock excavation. They were certainly not the one to one backslopes one would expect in common material. Nor does the design of a rip rap headwall (later deleted) at one point along this 8.42 miles of road negate the possibility that a bidder would encounter hard rock at some point nor confirm that a bidder might expect to find only common material for the length of the road.

In summary, the AGBCA decision on the facts is not arbitrary, capricious nor unsupported by substantial evidence, and its conclusions of law are not erroneous. The

---

**10.** 96 Ct.Cl. 148, 164 (1942). See also *Promacs, Inc.*, IBCA 317, 1964 BCA ¶ 4016.

**11.** *See* and *cf. Parker Construction Co. v. United States*, 193 Ct.Cl. 320, 433 F.2d 771 (1970).

board's decision on this Claim No. 1 is therefore final.

### No. 3  McDonald Creek Excavation
### Statement of Facts

The contract drawings show an 84 inch culvert, 126 feet long, to be installed at station 322 + 31. A detail describes the culvert as "type 1." Another drawing depicts a "type 1 installation" as being on the natural channel surface, and still another drawing depicts the culvert installed above the ground line. A topographic map of the McDonald Creek Bridge site depicts the culvert and road installation centered at station 322 + 31. The center line of the creek is shown to be serpentine, within exposed bedrock, and crossing an irregularly dropping terrain. The culvert itself is shown to be straight.

Plaintiff was required to drill and blast the rock for the full length of the culvert, and to backfill with earth in order to provide a proper bed for the culvert at the McDonald Creek Bridge. The relevant specification provides as follows:

§ 3.2  *Foundation Preparation:*
The pipe shall be bedded in an earth foundation of uniform density throughout the length of the culvert which is in accordance with the lines and grades given. Where rock ledges or boulders are encountered, they shall be excavated below the flow line of the structure to a depth of eight inches or one-half inch for each foot of cover over the pipe, whichever is greater. The width of such excavation shall be sufficient to eliminate any chance of the structure resting on rock. The excavation shall then be backfilled to proper grade with material meeting the requirements of Section 3.6.

Contract drawings show the ground elevation below the pipe at 5042.24 feet, and the elevation of the subgrade of the road at 5078.98 feet, or a difference of 36.74 feet. Deducting 7 feet (84 inches) for the diameter of the pipe itself, would leave approximately 30 feet of earth backfill above the

pipe. According to the above-quoted specification (which required one-half inch of bedding for each foot of fill) approximately 15 inches of bedding was therefore to be provided.

Although plaintiff observed McDonald Creek prior to bidding and saw that the culvert was to be installed on the solid rock bed of the Creek, plaintiff claims that it contemplated only the removal by drilling and blasting of "a couple of knobs" of rock, because a type 1 "installation is upon the natural channel surface."

### Discussion

This is an interpretation issue which requires a harmonious reading of all of the relevant drawings and specifications. General Provision 2 of the contract [12] provides in pertinent part as follows:

... Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In case of discrepancy either in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. Any adjustment by the Contractor without such a determination shall be at his own risk and expense....

It defies credulity that plaintiff expected to lay this culvert on the irregular rock surface of the bed of McDonald Creek, in light of the above cited drawings and specifications. Plaintiff in fact acknowledges that it observed the bed of the Creek and contemplated removal of some rock, but not as much as would be required to comply with the above-quoted § 3.2 of the specification "Foundation Preparation".

Moreover, the drawings, sheets 24 and 25, indicated by contours under the proposed culvert that rock would have to be

12. Strangely, this provision is not cited in the AGBCA decision, or by either party.

removed. The contours also show a curve in the Creek, requiring additional rock removal. The bedding requirements for the culvert were spelled out in the specifications. Plaintiff's assumption of just some minimal rock removal does not take into consideration any of the foregoing, nor the fact that a contoured excavation would be required to conform to the pipe circumference and to provide a uniform bedding surface.

In short, plaintiff was ordered to do no more than the contract required. The board's decision on this issue of interpretation, an issue of law, is not erroneous. Its decision on this Claim No. 3 is therefore final.

### No. 4 Engineering Errors and Delays

#### Statement of Facts

Paragraph A of Clause 2.2 of Forest Service General Provisions for Construction, as incorporated in this contract, provides:

A. Unit Price Pay Items. It is inherent in construction that variations from original quantities may occur because of (1) Changes in actual quantities from estimated quantities and/or Changes in the project during the course of construction to adjust to field conditions. Therefore, it is mutually agreed that within the meaning of the "Changes" clause of SF–23A General Provisions,[13] such changes are expected and normal, and shall not constitute a basis for adjustment in contract unit prices unless such variations or changes result in an increase or decrease in the original estimated quantities of more than 25 percent of any designated major item in the bid schedule, whether caused by changes in actual quantities

from original estimated quantities or changes in length of project.... All other changes are for consideration under the changes and differing site conditions clauses of Standard Form 23A ....

The AGBCA opinion acknowledges and enumerates a number of typical variations and corrections resulting from field conditions actually encountered, which had an impact upon the originally estimated quantities. The opinion finds that "Appellant was aware there would be changes necessary in the field ... and expected to rely on the equitable adjustment provisions of the contract ....."

In this claim, plaintiff asserts that "there were numerous grade changes and balance point changes for which the contractor was only compensated at the contract rate for excavation...." Numerous examples are offered. Plaintiff concludes that it is entitled to an "equitable adjustment for the extra amount of rock excavation performed by the contractor as a result of the engineering errors in the 162 + 67 to 172 area."

This is essentially the same claim disposed of above as "No. 1—Differing Site Conditions." Plaintiff also asks hereunder for an "equitable adjustment for the delay of one week which the Board found the contractor was delayed while awaiting grade changes ... (and a) fair and equitable determination of the amount of time contractor was delayed due to staking errors from the 165 to 175 area along with errors in (sic) changes in other areas ... (and the) amount of compensation due the contractor for the time delayed." Claimant argues that this "is a defective specifications claim. The Altered Quantities Clause (above-quoted) has no application to a de-

---

13. General Provision 3, "Changes", provides in pertinent part as follows:
    (a) The Contracting Officer may, at any time ... by written order ... make any change in the work within the general scope of the contract, including but not limited to changes:
      (i) In the specifications (including drawings and designs);
      (ii) In the method or manner of performance of the work; ....

    ....
    (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract ... an equitable adjustment shall be made and the contract modified in writing accordingly....

fective specifications claim .... The Government simply takes the position that it can do whatever it pleases with the staking as long as the as-built quantities do not exceed the original contract quantities by more than 25%. This position is untenable."

The AGBCA concluded:

Appellants asserted that numerous engineering errors in staking by the Government, resulted in disruption and delay in prosecution of the work. ... In this case numerous engineering adjustments were made before construction. As explained by Government testimony, the changes were predictable, arising from the design process of working from a preliminary survey line (P-line), to a final L-line or centerline which differs from the P-line due to conditions encountered in the field at the time of staking the road ... before construction. This procedure was known to the industry as one practiced by the Forest Service for 20 years or more. ... Appellants were aware of the practice. ... Other changes in the work were a result of the Government's accepting work as performed .... The contractor was compensated for the work at unit prices as performed ... and in some cases additional payment was made for two moves of material ... or cross hauls. ... Other changes were by Change Order ... agreed to by the contractor. In short, appellants have not supported their assertion of disruption and delay claimed to have resulted from generally faulty engineering.

Careful review of the record reveals only two instances in which alleged errors were not accounted for .... Proof of damages from these two instances were insufficient to support appellant's claims.[14]

14. Deletions shown in the above quote from the board's opinion are only of references to the record, or of citations to the board's findings of fact.

### Discussion

▮ Plaintiff in this claim suggests a level of perfection in the construction industry which would render unnecessary the "Unit Price Pay Items" and the "Changes" provisions, above-quoted. These clauses are standard and are present in this contract precisely because estimated quantities are just that, namely, estimates. Moreover, more formal changes ordered under the standard "Changes" provision are almost invariably required in every construction contract to adapt to field conditions actually encountered.

Nothing in the record indicates that alleged "engineering errors" resulted in variations in estimated quantities in excess of the 25 percent variation contemplated by that provision, so as to trigger an adjustment in the contract unit prices. Plaintiff's reliance on *United Contractors v. United States,*[15] is inappropriate because that was a case where the variations in quantity resulted from "Differing Site Conditions." In Claim 1, above, it has been determined that the conditions encountered here did not materially differ from those indicated in the contract documents, and that the Differing Site Conditions clause was not for application.

The AGBCA opinion has been set forth at some length above because it enumerates the board's findings and describes the relatively routine nature of these variations and changes. The board's decision on these facts has not been shown to be arbitrary, capricious or unsupported by substantial evidence, and its application of the relevant contract provisions to those facts is not legally erroneous. Its decision on Claim No. 4 is therefore entitled to finality.

### Conclusion

Plaintiff's Motion for Summary Judgment is denied and Defendant's Cross-Motion for Summary Judgment is allowed. The Petition shall be dismissed.

15. 177 Ct.Cl. 151, 368 F.2d 585 (1966).