**P.J. MAFFEI BUILDING WRECKING
CORPORATION**

v.

**The UNITED STATES.**

**No. 612–81C.**

United States Claims Court.

June 15, 1983.

Alvin S. Nathanson, Boston, Mass., for plaintiff; Nathanson & Goldberg, Boston, Mass., of counsel.

Robert M. Hollis, with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

### I.

In the performance of a contract involving the demolition of the United States Pavilion that had been constructed for the 1964 World's Fair in Flushing Meadow Park, New York, the contractor (plaintiff here) allegedly encountered differing site conditions and on that account claimed an equitable adjustment in contract price. The contracting officer denied relief and the matter was carried before the General Services Board of Contract Appeals (the board) for resolution. There it was held that the shortfall from the estimated amount of steel recoverable from the building (the salvage value of which represented part of the bid price) was (i) not monetarily redressable under the contract's "Differing Site Conditions" clause or (ii) otherwise compensable on a theory of Government misrepresentation. Entitlement was established, however, for the added work associated with the removal of unanticipated subsurface timber pilings. As to this last—the so-called "pile claim"—the matter was remanded to the contracting officer for a determination of quantum. The decision on appeal is reported administratively as the *P.J. Maffei Building Wrecking Corporation,* 80–2 B.C.A. (CCH) ¶ 14,647.

All three issues come up again in the complaint that has been filed in this court. Thus, in Counts I and II, both of which are directed to the steel shortage claim (herein the "steel" claim) the contractor asserts that the board decision is not entitled to finality under the Wunderlich Act, 41 U.S.C. §§ 321–322 (1976) first, because it reflects factual findings that lack substantial evidentiary support; second, because of errors of law. Accordingly, Count I repeats the claim to entitlement under the contract's "Differing Site Conditions" clause; Count II reasserts the misrepresentation argument. The contractor has moved for summary judgment in its favor; the Government opposes, and by cross-motion seeks our affirmance of the administrative decision.

Counts III and IV of the complaint introduce new matter. Herein the contractor claims the right to proceed in this court (rather than be obliged to continue before the board) to obtain a quantum determination on its previously-decided "pile claim". Count III asserts this right of "direct access" pursuant to § 10(a) of the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(1) (Supp. V 1981); Count IV asserts this right ostensibly as a "breach" remedy to the contracting officer's alleged unwillingness to have proceeded in good faith in the negotiations of the amount due on the "pile claim". The Government has moved to dismiss Counts III and IV for, respectively, lack of jurisdiction and failure to exhaust mandatory administrative remedies; the contractor opposes.

The court, having heard oral argument and having considered the record in the case together with the briefs of the parties, decides the case in the Government's favor on all counts. Our reasons are set forth in the section that follows.

### II.

#### *The Steel Claim*

A. The contract, as has been noted, involved the demolition and removal of the

pavilion (and restoration of the grounds) that had been built by the United States in connection with this country's participation in the 1964 World's Fair. The bid documents contemplated that the construction materials and other equipment to be removed from the building were to become the property of the contractor through an allowance for their value that was to be reflected in the bid price. Determination of the recoverable amount and market value of these "site materials" was a matter each prospective contractor had to evaluate on his own; the contract documents included no ready-made tabulation. Bidders were advised, however, of the availability for examination of some of the building's drawings at the administrative offices of New York City's Parks Department. It was through a study of documents obtained from this source, supplemented by site investigation, that the contractor in this case came to the conclusion that the demolition would yield 5,297 tons of steel. An assumed market value for this steel—roughly half-priced as scrap; the remainder as reusable—was included in the bid price.

In the performance of the contract the quantity of steel that was recovered fell short of the contractor's estimated amount by 1,075 tons—approximately 20 percent. A request for an equitable adjustment to cover the dollar amount of the unanticipated steel shortage was rejected by the contracting officer and, subsequently, by the board.

The thrust of the argument that had been made before the board was that, except for the drawings which the Government had made available for examination at the Parks Department, there was no other feasible means by which a prospective bidder could ascertain the amount of steel that comprised the building's skeletal structure. Even destructive testing, assuming that had been permissible, might not have given a better answer. Thus, when upon

demolition, some steel beams were recovered that were found to be of lesser weight than had been depicted on the drawings, the resulting variance was claimed to constitute a differing site condition for which, by the terms of the contract, an equitable adjustment was promised.

The contract clause in question, paragraph 4 of the General Provisions, entitled "Differing Site Conditions", assured the contractor of an equitable adjustment in contract price and/or time if, during performance of the work there were encountered "[s]ubsurface or latent physical conditions at the site differing materially from those indicated in this contract * * * "[1] The board deemed this language to be inapplicable to the situation before it.

As the board reasoned it, the quoted language could be invoked by a contractor only when relief was sought for a condition different from that which had been "indicated" in the contract. That is to say, the contract had to offer some basis from which a contractor could reasonably infer the subsurface conditions likely to be encountered. Absent any "indication" in the contract, no claim for a changed condition could arise. At the same time, the board also recognized that such contract indications need not be explicit or specific. "[A]ll that is required is that there be enough of an indication on the face of the contract documents for a bidder reasonably not to expect 'subsurface or latent physical conditions at the site differing materially from those indicated in this contract'." *Foster Construction C.A. v. United States,* 193 Ct.Cl. 587, 593, 435 F.2d 873, 875 (1970).

In this case, however, it was concluded that "the contract provided the appellant with no information or estimate of the type or quantity of steel in the building." *P.J. Maffei Building Wrecking Corporation,* 80–2 B.C.A. (CCH) ¶ 14,647 at 72,259. There was, as the board had also put it "no

---

1. The "Differing Site Conditions" clause also promises relief for extra costs caused by "unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract". The board had also rejected the application of this clause to the contractor's steel claim. The correctness of that rejection is not contested here.

* * * affirmative representation of the quantity of steel." *Id.* Hence, the claim was denied.

The contractor challenges the correctness of the board's reading of the contract. The argument centers on paragraph 1.2 of the contract's Special Conditions which reads, in relevant part, as follows:

> Some drawings of some of the existing conditions are available for examination at the New York City Parks Department's Administrative Building at Flushing Meadow Park, Flushing, New York. These drawings are for information only and will not be part of the contract documents. The quantity, quality, completeness, accuracy and availability of these drawings are not guaranteed. * * *

Concerning this language, two arguments are made. The first is that, contrary to what the board had said, the contract did, indeed, set forth a representation by the Government respecting subsurface conditions. And that representation, as set out in the quoted paragraph, was that, to the extent contract drawings were made available, those drawings would depict "existing conditions". Hence, when the contractor obtained drawings of the building's steel structure, he had a right to assume (so the argument goes) that on-site conditions would conform with the drawings.

The second part of the argument is that the Government's intended disclaimer of the completeness and the accuracy of the drawings is legally ineffective. As authority for this point the contractor cites a number of decisions in which the court overrode exculpatory language in favor of the policy considerations in an unrestricted applicability of the Differing Site Conditions clause.

Typical of the cases relied upon are *Foster Construction C.A. v. United States, supra,* 193 Ct.Cl. 587, 435 F.2d 873 (1970) and *Fehlhaber Corp. v. United States,* 138 Ct.Cl. 571, 151 F.Supp. 817, *cert. denied,* 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957), where the Government had attempted, by specific contract language, to disavow responsibility for the accuracy of the boring data that it had incorporated into the contract drawings.

The court rebuffed these risk-shifting efforts saying in *Foster* that "[f]aithful execution of the policy [favoring economy in bidding] requires that the promise in the changed conditions clause [now the Differing Site Conditions clause] not be frustrated by an expansive concept of the duty of bidders to investigate the site." *Foster Construction C.A. v. United States, supra,* 193 Ct.Cl. at 614, 435 F.2d at 887. And in *Fehlhaber,* the point was made that "[p]laintiff had a right to rely on the Government's specifications and drawings and the Government is bound by any assertions made therein notwithstanding the fact that it was stated that, that data would be for information only." *Fehlhaber Corp. v. United States, supra,* 138 Ct.Cl. at 584, 151 F.Supp. at 825.

It is upon these joined grounds then—the Government's representation that the drawings depicted existing conditions and the ineffectiveness, as a matter of law, of contract language that would erode the promise of the Differing Site Conditions clause—that plaintiff bases its assertion of legal error in the board's opinion.

The argument plaintiff makes is not an insubstantial one. Indeed, given that contract indications of subsurface conditions need not be explicitly stated in order to command contractual significance, then certainly information of site conditions, as translatable from contract drawings, would satisfy the requirement of a contract indication.

Although the board's opinion had not addressed this point specifically, nevertheless a rejection of the argument is necessarily embraced in the conclusion that "the contract provided * * * no information * * * of the * * * quantity of steel in the building." 80-2 B.C.A. at 72,259. The Government now says, this in defense of the board's result and in answer to plaintiff's argument, that the drawings were described as being for "information only and * * * not * * * part of the contract documents." Hence—the argument continues—whatever

information the drawings might offer with respect to subsurface conditions would nevertheless not qualify as contract-indicated data.

The court cannot accept this position. It may be that the drawings were not part of the contract in a physical sense but certainly the reference to them was. That is enough. Given the policy considerations underlying the Differing Site Conditions clause, it is simply not an acceptable maneuver for the Government to dodge the responsibilities of that clause by exculpatory clauses, or, as we have it here, by placing a non-contractual label on what is plainly relevant contract information. Efforts of this last sort have not found favor. *Jack Crawford Construction Corp.,* 75–2 B.C.A. (CCH) ¶ 11,387 at 54,214.

However, the sticking problem here is not whether the information depicted in the drawings would qualify as an indication of subsurface conditions within the intention of the Differing Site Conditions clause. Rather, granted that it would, the real problem is whether the contractor can justifiably argue that it relied on the information shown in the drawings and suffered injury because that information proved wrong. The testimony heard below does not support such a case.

There it had been brought out (this upon cross-examination of the contractor) that (i) the drawings received from the Parks Department were recognized as being preliminary design drawings rather than drawings depicting an "as-built" structure, (ii) that it was further recognized that the "as-built" conditions (synonymous with existing conditions so far as the building's steel structure would be concerned) might actually have varied from those shown in the preliminary design drawings, and (iii) that the possibility of such a variance was taken into account in the determination of the quantity of steel that might be recovered from the building.

■ In relating this testimony to the problem at hand, we need not read into it, as the board did, a positive awareness on the contractor's part that the drawings did not reflect existing conditions. (The board had said "[t]he appellant admits that it was aware that the drawings did not reflect 'as-built' conditions." 80–2 B.C.A. at 72,-256.) For our purposes, it is enough to note that the testimony is a clear acknowledgment by the contractor that the drawing data was not accepted at face value, but, instead, was modified to reflect the contractor's own assumptions of probable site conditions. Hence, given those facts, the contractor cannot say, as its present argument does, that it was misled by reliance upon the drawings; it would fit with the facts just as well to say that the error lay in the adjustment which the contractor had applied to the drawing data.

What comes out of this is that, by having anticipated the very variation from contract-indicated conditions of which it now complains, the contractor may not simultaneously assert a cause of action that, in essence, claims reliance on the accuracy of conditions as stated. "The fact that plaintiffs admitted they had anticipated the condition for which they are claiming an equitable adjustment provides strong support for the conclusion that a changed condition was not encountered." *Wm. A. Smith Contracting Co. v. United States,* 188 Ct.Cl. 1062, 1088, 412 F.2d 1325, 1339 (1969). To the same effect, *Clack v. United States,* 184 Ct.Cl. 40, 47, 395 F.2d 773, 777–78 (1968).

Reliance on the physical conditions at the site *as indicated in the contract* is the essence of a differing site conditions claim. It is that element which is missing here.

B. In addition to the legal issue just discussed, the contractor has also challenged certain fact findings of the board pertinent to the steel claim. The court has examined these issues but finds it unnecessary to discuss them since they would not change the result that has been reached.

*The Misrepresentation Claim*

A second argument which the contractor renews here is the contention that the Government is liable for material misrepresentation of fact either (i) by virtue of

having falsely identified the contract drawings furnished plaintiff as drawings depicting "existing conditions" or, (ii) by virtue of having withheld from plaintiff those drawings that did, in fact, accurately portray the building's "as-built" conditions.

There is no merit to either branch of this argument. As to the first part of it, the shortest answer is that there was no false statement. The contract language in question—"some drawings of some of the existing conditions"—was a representation that came replete with caveats. Literally in the same paragraph (one could almost say "in the same breath") that the Government advised of the drawings, it went on to say that neither their "quantity, quality, completeness, accuracy and availability" was being guaranteed. In assessing a claim of misrepresentation, such warnings may not be disregarded for "[w]hether a statement is false depends on the meaning of the words in all the circumstances, including what may fairly be inferred from them." *Restatement (Second) of Contracts* § 159 comment a (1979); *Flippin Materials Company v. United States,* 160 Ct.Cl. 357, 364 n. 7, 312 F.2d 408, 413 n. 7 (1963).

■ Cautions respecting their reliability in use were part and parcel of the Government's advice concerning the availability of the drawings. And reasonably read, those cautions provided fair warning that existing conditions might not be accurately depicted. The cautioning language here forecloses any claim of false statement by the Government.

■ As to the second half of the argument—that the Government's failure to disclose the existence of "as-built" drawings amounted to misrepresentation by non-disclosure—the contention lacks merit. Indeed, it is plainly contrary to the record to suggest, as plaintiff's argument does, that drawings produced by the Government in response to a 1978 discovery request differed significantly from those made available at the time of bidding. So far as the structural steel was concerned, plaintiff's own witness unequivocally conceded that the two sets of drawings were the same.

Aside from this failed effort, plaintiff offers absolutely nothing else upon which to support its contention that the Government withheld superior information respecting the building's steel structure.

*The Pile Claim*

As was earlier pointed out, a claim for unanticipated subsurface timber pilings was allowed by the board. Recovery was premised on that part of the contract's Differing Site Conditions clause which afforded relief for unanticipated costs due to "unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract." The board had remanded this matter to the contracting officer "for the purpose of equitably adjusting that claim." 80–2 B.C.A. at 72,262.

The negotiations on quantum between contractor and contracting officer did not accomplish their purpose. The parties, it seems, disagreed on the standards by which to price the claim (actual cost versus reasonable value) as well as on the Government's right of access to the contractor's books of account. Roughly six months after the remand and with nothing yet accomplished, the contractor wrote the board asking that the matter be assigned for a hearing on the issue of quantum as soon as possible. This was in March 1981. On June 5, 1981, the board wrote the parties to confirm agreement on a hearing date then set for mid-October 1981. However, very shortly after this confirmation of schedule, the contractor decided in favor of pursuing a quantum determination in this court. To that end, it moved the board to dismiss the quantum claim pending there without prejudice to a right of reinstatement. The board allowed this motion; the quantum claim was then brought here.

There are two grounds upon which the contractor bases its claimed right to proceed with a quantum determination in this court rather than before the contract appeals

board. These are: (i) the right of direct access contemplated by section 10 of the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(1) (Supp. V 1981), and (ii) the right to judicial relief in remedy of the contracting officer's breach of the contract's disputes process by his allegedly arbitrary negotiating posture. The Government has moved for dismissal; we agree the contractor's contentions are not legally supportable.

Addressing first the right of direct access being claimed under the Contract Disputes Act of 1978 (the Act), it is clear that, in the case of contracts executed prior to March 1, 1979 (the Act's effective date and the case here), the Act is applicable at a contractor's option but only with respect to a claim that was "pending then [*i.e.*, March 1, 1979] before the contracting officer or initiated thereafter". Contract Disputes Act of 1978, Pub.L. No. 95–563, § 16, 92 Stat. 2391, 41 U.S.C. § 601 note (Supp. V 1981). And since, in this case, the claim in issue (the pile claim) was actually pending before the contract appeals board on March 1, 1979 (but then not yet decided), it follows that the avenue to a direct access remedy is further narrowed. The question comes down to whether the referral of a liability-decided matter to a contracting officer for negotiations on quantum and the emergence thereafter of a dispute on pricing, may be regarded as marking the end of one claim and the beginning of another.

The virtually identical question had been raised in *Nab-Lord Associates v. United States,* 230 Ct.Cl. ——, 682 F.2d 940 (1982); it was there answered in the negative. In that case, the contractor had prevailed before a contract appeals board on six different claims for equitable adjustment. These determinations of entitlement were then remanded to the contracting officer for determination of amount. Thereafter, the parties were able to reach settlements on each of the claims while explicitly reserving the question of entitlement to interest. Several of these settlements had occurred prior to the effective date of the Contract Disputes Act while others were agreed upon after March 1, 1979. The interest claims were

thereafter appealed to the board, the theory of recovery being that they represented claims that had been pending before the contracting officer on the effective date of the Act; hence, the interest-granting provision of the Act was arguably applicable. The board, however, rejected the claims on the theory that since quantum had been resolved by settlement, there was in effect no dispute between the parties and, therefore, by definition, no claim.

The court found this reasoning unsatisfactory. In the court's view, it was not the absence of a dispute that impaired the contractor's interest demands. Rather, it was the fact that the underlying claims were not then pending before the contracting officer but were, instead, before the board.

The court explained: "In 1977, the contracting officer's denials of petitioner's entitlement to the underlying claims were appealed to the board. The board reversed the contracting officer and held that petitioner was entitled to receive payments for certain contract adjustments and it remanded the claims to the contracting officer in order that the *amount* of the claims could be negotiated. The relevant underlying claims were, therefore, on the effective date of the act, pending before the board and not before the contracting officer. The contracting officer was acting as a representative of the board when he negotiated with petitioner the amount petitioner should receive for the contract adjustments allowed by the board's favorable rulings as to entitlement." *Nab-Lord Associates v. United States, supra,* 230 Ct.Cl. ——, 682 F.2d 940, 943 (1982) (footnote omitted).

■ .The reasoning of the court, as expressed in the quoted text, is fully dispositive of the instant case. Here, as in *Nab-Lord,* the contracting officer had entered a final determination adverse to the contractor which, upon being reversed on appeal, was then returned to the contracting officer for negotiation of amount. And it having been held in *Nab-Lord* that claims in such a remanded posture are still to be considered as pending before the board and not the

contracting officer, it follows here, for the same reason, that a pricing dispute that emerges upon remand would not alter the status of the underlying claim—it remains pending before the board. The short of it is that plaintiff is not entitled to proceed under the Act with respect to the quantum determination on its pile claim since that claim neither was pending before the contracting officer on March 1, 1979, nor was it initiated thereafter.

As to the alternative argument that plaintiff is entitled to pursue a breach remedy here on account of the contracting officer's allegedly arbitrary negotiating posture, this too is an argument that cannot be endorsed.

So far as the court can tell from the few facts that bear on the point, there was no delay on the part of the contracting officer in acting on plaintiff's quantum demands nor any assertion of a position so extreme as to suggest a purpose to frustrate the negotiation process.

All that the contractor can point to in this regard is the contracting officer's insistence upon a cost breakdown free of suspected extraneous items and a decision to develop the equivalent data unilaterally when the requested information was not forthcoming. That the contracting officer should wish to have some reliable cost data on hand before proceeding with the quantum negotiations is hardly a plausible basis for saying that he had demonstrated an unwillingness to honor his covenant to provide a "proper and conscientious first decision." *New York Shipbuilding Corp. v. United States,* 180 Ct.Cl. 446, 460, 385 F.2d 427, 435 (1967).

If there is more to the matter than has been given here, plaintiff has failed to show it. The claim belongs before the contract appeals board and the facts offer no basis upon which the court could say otherwise.

### III.

For the reasons given herein, plaintiff's motion for summary judgment as to Counts I and II of the complaint are denied and the Government's cross-motion for summary judgment is granted. As to Counts III and IV of the complaint, the Government's motion for summary judgment is granted. Accordingly, it is ordered that the complaint in its entirety be dismissed.